942 So.2d 658 (2006)
STATE of Louisiana, Appellee,
v.
Richard B. WOODS, Appellant.
No. 41,420-KA.
Court of Appeal of Louisiana, Second Circuit.
November 1, 2006.
*659 Louisiana Appellate Project by Sherry Watters, Carey J. Ellis III, Richard B. Woods, for Appellant.
Jerry L. Jones, District Attorney, Geary S. Aycock, Assistant District Attorney, for Appellee.
*660 Before STEWART, CARAWAY and LOLLEY, JJ.
STEWART, J.
The defendant, Richard B. Woods, was convicted of the second degree murder of Julie Woods, aggravated battery of Keith Wyman, and attempted manslaughter of James Sullivan. He was sentenced to life imprisonment without benefit of probation, parole, or suspension of sentence on the conviction for second degree murder. He was sentenced to serve 10 years at hard labor on the conviction for aggravated battery and 12 years at hard labor on the conviction for attempted manslaughter. The sentences were ordered to run concurrently. A motion to reconsider was denied, and this appeal followed. For the reasons set forth below, we affirm the defendants' convictions and sentences.

FACTS
Richard and Julie Woods were husband and wife. Richard Woods, who had alcohol and drug problems before meeting Julie, went through rehabilitation and then moved to West Monroe, Louisiana where he met Julie, who had recently completed treatment for substance abuse. The couple moved into a trailer that belonged to Julie's mother, Aleda Johnson. Their relationship was troubled, and Julie often stayed several days out of the week in the nearby home of James Sullivan who was a longtime friend of Julie and her family. Mr. Sullivan, who was 70 years old, had taken Julie to receive treatment for her substance abuse. Mr. Sullivan's house was located across the field from Mike's Cabinet Shop where Richard worked. An abandoned mechanic shop was on the property adjoining Mr. Sullivan's home, and there was a lot of drug activity in the area. Julie suffered a relapse, and her drug problems recurred. As will be discussed more fully below, there is a factual issue in this case as to whether Mr. Sullivan was supplying drugs to Julie and allowing others to use his property for drug use, or whether Mr. Sullivan was simply living in a bad neighborhood and trying to help Julie. However, there is no dispute that Richard Woods was not happy about his wife staying at Sullivan's house and wanted her to live with him in the trailer. As a result, he went Sullivan's house on numerous occasions to try to persuade his wife to return home. These disputes set the backdrop for the violent events of July 30, 2004, in which Richard Woods murdered his wife by cutting and stabbing her, and severely injured Keith Wyman and James Sullivan with the same knife.
Witnesses for the Prosecution
The first witness to testify for the prosecution was Sgt. Ricky Bacle of the Ouachita Parish Sheriff's Office (OPSO). Sgt. Bacle testified that on July 30, 2004, he received a report of a stabbing in progress on Bailey Street and that the suspect was a white male wearing a red t-shirt and blue jeans, heading toward a Spirit gas station. When Sgt. Bacle arrived in the area, Richard Woods exited the Spirit service station and said, "I guess you're looking for me." Woods then showed Bacle where he had left the knife in a nearby field.
The next witness was Cpl. Sams also of OPSO. Like Sgt. Bacle, Cpl. Sams indicated that he had taken a call regarding a stabbing on Bailey Street and that the suspect allegedly was enroute to the Spirit gas station there. Because two units were already at the station when he arrived, Sams went to Bailey Street where he was met by Keith Wyman, who was holding a towel on the side of his face and hysterically screaming that he and some other people had been stabbed. Cpl. Sams stated that Wyman's knife wound appeared to *661 go all the way through the side of his face into the inside of his mouth. Cpl. Sams also observed two subjects lying on the porch of the residence. The subjects were Julie Woods and James Sullivan, who were "pretty much covered in blood from head to toe."
Jim Gregory, a captain at the OPSO, also testified. His testimony was used to introduce into evidence the knife used to commit the murder. He testified as to the appearance of the Sullivan house after the murder took place as depicted in trial photographs. He also testified to finding some crack pipes in the house; the pipes were located under some carpet in a bedroom in the middle of the house.
Julie Woods' mother, Aleda Johnson, was the next witness to testify. She indicated that she had told them if there was going to be any fussing and fighting "they could take it somewhere else." She noted that Richard Woods worked at Mike's Cabinet Shop when Richard and Julie moved into the trailer on her property. She also testified that she has known Mr. James Sullivan ever since they were in grade school, and that he lived on Bailey Street only about a mile and a half from her home. According to Ms. Johnson, their families had been friends for many years and he was like a "godfather" to her children. In the week before the murder, Ms. Johnson indicated that Julie had stayed at Mr. Sullivan's house for a couple of days, and that Julie normally went there when she and "Ricky" would "get into a fuss." The day before the murder, Woods came to Johnson's house and got his clothes out of the trailer indicating that if Julie was not going to stay there, he was not going to stay there. Johnson also saw Richard Woods at Mike's Cabinet Shop on the day of the murder where he had asked her if she wanted to buy a DVD player from him for $10.00.
One of the more significant witnesses in the case was Dr. Frank Peretti, a forensic pathologist who testified concerning the wounds inflicted on Julie Woods. He began his description of those wounds starting at the top of her head and working downward. He stated that the wounds were caused by a knife, indicating that while all the wounds contributed to death by blood loss, there was one wound more fatal than the others. That wound was behind Julie Woods' left knee. It was a stab wound measuring two and a half inches in length that went through the skin, the underlying tissues, muscles, tendons, and completely cut the left popliteal artery and vein, ultimately causing Julie Woods to exsanguinate. The wound was two and three quarters inches deep. There also was an irregular jagged cutting wound on her left leg that indicated she was moving and twisting, attempting to get away from the person inflicting the wound on her. Some of the wounds he described as being defensive wounds. He also stated that there was cocaine in Julie Woods' bodily fluids indicating that she had consumed cocaine within a 24-hour period prior to her death. Dr. Peretti stated that Julie Woods had 15 cuts and 1 stab wound, and he reiterated that she had what he called defensive wounds on her arms. He opined, based on his experience, that the type of injuries sustained were not accidentally sustained. The next prosecution witness was Keith Wyman. Mr. Wyman was the boyfriend of Rhonda Allbritton, who at one time had been married to Mr. Sullivan's son. Wyman and Allbritton were visiting Sullivan's house at the time of the murder. According to Wyman, he and Allbritton had only been at Sullivan's house for a few minutes before the incident occurred. He met Julie Woods for the first time there, and nobody else was at the house besides *662 Mr. Sullivan and Julie Woods when they arrived. Richard Woods knocked on the door while they were there, wanting to talk to Julie. After consulting with Julie, Mr. Sullivan told Woods that she did not want to talk to him and that he should come back later. However, Woods came into the house anyway. Mr. Sullivan then indicated to Woods that he should leave, Woods became upset, and Wyman could tell "by the look in the eyes" that Woods was going to jump on Mr. Sullivan. Wyman stepped between Sullivan and Woods, and pushed Sullivan back with his arms. He was then cut on his face by Woods. According to Wyman, he did not know that Woods had a weapon until that point. The wound required 79 stitches to close.
Sullivan told Julie to run. Rhonda ran to the backdoor but could not get the door to open, so Wyman kicked the door open and Rhonda ran out. At this point, Wyman turned around and saw Mr. Sullivan fall to his knees in the living room and saw Woods walking into the bedroom where Julie had gone. Wyman went to the kitchen to look for something he could use to arm himself and found a frying pan and a bow saw. When he turned around, he saw Woods "just slashing on Ms. Woods, hollering you know I love you, you don't understand I love. . . ." Wyman then ran after Woods who ran out of the house. Although Wyman caught up with Woods who had tripped and fallen in a ditch, Wyman did not attack Woods because Rhonda had screamed out to him. Instead, Wyman returned to the house where Sullivan and Julie Woods had managed to get to the front porch. Wyman tried to help the two who were bleeding, but Wyman testified that he realized Woods was dying and there was nothing more he could do.
Wyman admitted that he had a criminal history including convictions for simple burglary, second degree battery, simple kidnapping, and forgery. He also indicted that he was currently awaiting trial on a drug charge. However, he denied supplying Julie with drugs and indicated he had never sold drugs in his life. He also denied that he or Rhonda was using drugs that day.
Rhonda Allbritton was the next prosecution witness. Her version of the events surrounding the murder largely corroborated that of Wyman. She testified that no one besides Woods had a weapon at the time Woods pulled out the knife, that she did not see anyone jump on Woods before he pulled out the knife, and that no one was threatening Woods. She testified that Julie was not aggressive toward Richard Woods at the time, that Sullivan had no weapons that she saw, and that he did not attack Richard Woods in any way. She denied knowing that there were any drugs being used at the house when she was there, but she admitted to being convicted of a marijuana charge in the '80's and to having a shoplifting charge. She also admitted to having pending charges for simple possession and paraphernalia. Allbritton saw Wyman and Sullivan get cut, but she did not see what happened to Julie.
Allbritton testified that she knew Julie stayed in the bedroom in Sullivan's house, and that the room was "kind of like a rent room where others had stayed." She indicated that a Bobby Taylor and a Mike Davis had stayed there before, but she denied knowing that the room was known as the crack room or that people would go there to smoke crack. However, she admitted that she had smoked crack "once or twice" before. According to Allbritton, she had never met Richard Woods before that day, but had met Julie a few times at Sullivan's house. Although she admitted that she did not go from room to room in *663 the house that day, she did not think anyone else was in the back part of the house.
The last witness for the prosecution was James Sullivan, who testified that he had known Richard Woods for about a year or better, and that he had been knowing Aleda Johnson ever since she was seven or eight years old. He also knew all of Johnson's children. He also indicated that Rhonda Allbritton had been married to his son who had passed away, and that she came to visit him periodically. With respect to Julie Woods, he stated that he was aware she had a substance abuse problem and that he had tried to help her by taking her for treatment to Alexandria, Louisiana where there was a substance abuse treatment center. He indicated that there were occasions after she married Richard Woods that she would come and stay at his house, and that she had been there off and on for over two years. He indicated that he had allowed Bobby Taylor to stay at his house when Taylor had no place to stay, but he denied allowing people to consume drugs in his house, and he denied selling drugs. He also indicated that before the day of his testimony he was unaware that the police had found crack pipes in the back bedroom under the carpet. Sullivan also indicated that when Julie was staying at his house, Richard Woods would come down to see her and that he had asked Woods to leave because Julie did not want to have anything to do with him.
Sullivan stated that on the day of the murder Woods had come to his house around 9:00 a.m. to talk to Julie, but Julie did not want to talk to him, so he asked Woods to leave. Rhonda Allbritton and Keith Wyman came to Sullivan's house around 10:30 a.m. Sullivan was in the kitchen cooking some peas and a duck. When they arrived, the only people in the house were Sullivan and Julie, and as they talked, Richard Woods arrived. Sullivan again told Woods that Julie did not want to talk to him, and Sullivan did not invite him in. Sullivan tried to convince Woods to leave, but Woods forced his way into the home. According to Sullivan, he asked Woods about four or five times to get out of the house, and Allbritton and Wyman also told Woods he should leave. When Wyman started to get up, Woods pulled a knife out of his shirt and struck Wyman across the face. When Sullivan told Allbritton to run out of the house, he was struck by the knife in the area near his collarbone. Sullivan threw up his arms and was struck about three more times. Sullivan saw Woods strike Julie a couple of times before he fled outside to cry for help. Sullivan could hear Julie hollering, but he could not tell what she said because he was in poor condition himself. Sullivan indicated that before Woods pulled the knife out, he did not know there was going to be an attack on him or any of the other people.
Lastly, Sullivan denied allowing Julie or others to use his house to smoke crack, and testified that he did not use drugs, drink, or smoke. He also indicated that he had no criminal record. On cross examination, Sullivan admitted that Julie came to his house regularly to stay Thursday through Sunday, and sometimes longer. He did not think it strange that she came to his house "because she would show me bruises and everything where he had jumped onto her." He indicated that there was a shop next to his house where people hung around and that there could have been illegal activity going on, but he did not "meddle in nobody's business." Sullivan admitted to threatening Woods with his machete after he caught him in his backyard a couple of months before the incident.
*664 Witnesses for the Defense
The first witness for the defense was Mike Garrett, the owner of the cabinet shop and the employer of Richard Woods. Garrett said that Julie usually came to the cabinet shop every Friday, and that Friday was Woods' payday. Garrett said that he was familiar with the fact that Julie would spend days at Sullivan's house, and Garrett stated that people were hanging around Sullivan's house all the time. Garrett indicated that on the morning of the murder, he saw Woods near the home of Garrett's daughter who lived near Sullivan.
Garrett further stated that Woods had walked up to his truck and told him that the men he had been talking to had a gun, that they wanted money for crack, and that if Woods did not have the money by noon they were going to shoot him. Garrett then went to his shop, made out the payroll, and later paid Woods who left around 11:00 a.m. In the meantime, Woods had attempted to pawn a DVD player to get money to pay for the crack. According to Garrett, the last time he saw Woods that day was on the porch of Sullivan's house; the three men who had been talking to Woods that morning were sitting in the front yard.
Garrett testified to his knowledge of Julie's substance abuse problems, and he stated that Woods had told him that Julie was clean until two or three weeks before the murder. He denied knowing that Woods had been on a two-or-three-day binge of drinking and smoking crack prior to the murder. However, he indicated he was aware that the area around Bailey Street was an area where drugs were sold on a regular basis.
Richard Woods testified in his own defense. Woods testified that he was aware of Julie's drug dependency problem before they married. He admitted that he had had a drug dependency problem also, but had gone to rehabilitation prior to moving back to West Monroe. According to Woods, Julie frequently stayed at Sullivan's house after their marriage until Woods had rented a trailer. However, Julie still returned to Sullivan's house just about every weekend. Woods stated that he had confronted Sullivan many times asking, "why do you just keep giving her the dope and letting her in your house, why don't you just turn her away." Woods also stated that he had seen Sullivan buy dope for Julie, and that there were people around Sullivan's house all the time using drugs. He claimed that Julie's drug problems caused him serious financial problems.
Woods' testimony about events leading to his going to Sullivan's house on the day of the murder essentially matched those of Garrett. Woods indicated that the three black men who approached him that day wanted money for dope that he had gotten about a month before. Woods then went to the cabinet shop for a while and later returned to Sullivan's house where Sullivan and Julie were sitting on the porch with the three black men in the yard. Woods allegedly told them that Garrett would come over to pay them at three o'clock. Woods admitted to having a knife in his pants, so he would have something to scare the men in case he ran into them when he went to talk to Julie.
On Wood's second trip to Sullivan's, Albritton and Wyman drove up, and everyone was in the house by the time Woods arrived, except for the three black men who were still outside sitting in chairs. Sullivan allegedly came out of the house and bought dope from one of the black men and went back into the house. Woods claimed that he asked Sullivan if he would ask Julie if she would talk to him. Next, Wyman came out of the house, but was called back in by Albritton who told him *665 that Sullivan said that they could smoke the dope in the house. When Woods came into the house, he tried to persuade her to leave. Wyman allegedly asked Sullivan if he wanted him to get Woods. Woods admitted getting excited and yelling while talking to Julie and stated that Albritton told him that he needed to quiet down. Julie then got up and told Woods to leave her alone and went into the kitchen with Woods following her. Julie then left the kitchen and sat back down on the couch, but then jumped up and went to Sullivan's bedroom. Again, Woods followed her and tried to persuade her to come home.
Sullivan told Woods he needed to leave, and Woods then told Sullivan that he wanted to know the truth about what was going on between him and Julie, because he was not "buying all that dope" without getting something out of it. Julie then allegedly stated, "I do what I have to do to support my habit," and Woods then left the bedroom, told her there would be a divorce, and told her not to call his job anymore. At this point, Wyman allegedly jumped up and grabbed Woods, who then struck him in the face and knocked him back down into his chair. Woods claimed that Sullivan then grabbed and held him while Wyman approached with something in his hand. Woods said he then grabbed the knife and cut Wyman's face. Sullivan purportedly "fell into" the knife when he had Woods by the throat and Woods stabbed at Sullivan to get Sullivan off of him. Woods said he then "saw a foot come up" and he slashed at the foot. Woods then recognized that he had cut Julie on the back of her leg. Woods asserted that he was trying to look at the cut when Julie allegedly "leaned back on the knife and the knife was in her and I was trying to get it out of her and it wouldn't come out and then I pulled it out she was bleeding. . . ."
On cross-examination Woods' only explanation for how Julie received the other cuts was that they occurred when he was swinging the knife. He said that he did not realize who or what he was cutting. He testified that about a month before he had given Julie crack and smoked it with her, but that his intent was to get her away from Sullivan's house. He also admitted that during the three days prior to the killing he had been drinking and smoking crack. He also admitted that during this period of time he was getting angry at Julie, because she had promised that she was not going to return to Sullivan's. Significantly, Woods admitted that someone had told him that night before the killing that Julie had offered to sell herself to a man in order to get crack and that Woods had later told Deputy Sams that after hearing this his heart was pounding and he was hurt. Woods also had admitted that the same night he had told Garrett's son-in-law as "a joke" that he had stabbed Julie.

DISCUSSION
Sufficiency of Evidence
The defendant argues that the State's evidence was insufficient in two ways: (1) the State failed to prove beyond a reasonable doubt that Woods had a specific intent to kill Julie Woods; and (2) while the mitigating factors of heat of blood or sudden passion were proven by preponderance of the evidence, the State failed to rebut these factors. The defense points out that Richard and Julie Woods were having problems concerning her drug use, and the defense asserts that James Sullivan and his home facilitated her addiction. The defense also argues that when Woods was talking with Julie about leaving, there was no physical contact until the others intervened and escalated the situation. According to the defense, this shows *666 that there was no specific intent to kill, but that what happened was an impulsive, unplanned act in the sudden heat of blood or passion. Additionally, the defense argues that whether or not Wyman had a weapon is irrelevant, as Woods perceived himself to be under attack from Wyman, a larger man, thus "raising his heat of blood." Finally, the defense argues that despite Sullivan's and others' denials that they were using drugs in the house, Julie's cocaine level was very high at the time of her death and, when considering the facts in the light most favorable to the State, no rational trier of fact could have found that the mitigating factors were not established by a preponderance of the evidence. Accordingly, the defense's position is that the State only proved manslaughter.
On the other hand, the State argues that the jury obviously chose to believe the testimony of Wyman, Albritton and Sullivan, who were eyewitnesses to Wood's unprovoked brutal attack on the unarmed victim. The State points out that according to Wyman, Woods approached Sullivan as if he wanted to jump on him, and then Wyman stood between the two to prevent an altercation. At that point, Woods produced a knife and cut Wyman from his ear to his mouth. After Wyman helped Albritton get away, he noticed that Sullivan had been cut, and he observed Woods in the bedroom attacking Julie with a knife, using a slashing motion at least fifteen times upon the victim. The State points out that Albritton's testimony corroborated Wyman's testimony, and that Sullivan had testified he asked Woods four or five times to leave. Furthermore, Sullivan testified that he never had a weapon during the attack. The State also noted Dr. Peretti's testimony concerning the multiple wounds that caused the victim to bleed to death and his testimony that the wounds were intentionally inflicted. Finally, the State pointed out that Woods himself admitted to smoking crack and drinking over a three-day period prior to the killing, that he was mad with his wife for returning to Sullivan's house, that he was upset because he had heard that she was selling herself for crack, and that on the night before the murder he "joked" that he had stabbed his wife. Thus, the State argues that the evidence presented supports the jury's verdict of second degree murder, and that the defendant failed to prove by a preponderance of the evidence the presence of mitigatory factors that would entitle him to the responsive verdict of manslaughter.
The provisions of La. R.S. 14:30.1 state in pertinent part that second degree murder is the killing of a human being when the offender has a specific intent to kill or to inflict great bodily harm. Specific intent is that state of mind that exists when the circumstances indicate the offender actively desired the proscribed criminal consequences to follow his act. La. R.S. 14:10(1); State v. McCray, 621 So.2d 94 (La.App. 2d Cir.1993). Specific intent is a state of mind and need not be proved as a fact. It may be inferred from the circumstances of the transaction and the actions of the defendant. State v. Graham, 420 So.2d 1126 (La.1982). The determination of whether the requisite intent is present in a criminal case is for the trier of fact. State v. Huizar, 414 So.2d 741 (La.1982); State v. Dean, 528 So.2d 679 (La.App. 2d Cir.1988). In reviewing the correctness of such a determination, the court should review the evidence in the light most favorable to the prosecution and must determine whether the evidence is sufficient to convince a reasonable trier of fact of the guilt of the defendant beyond a reasonable doubt as to every element of the offense. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2081, 61 L.Ed.2d 560 (1979); State v. Huizar, supra.
*667 In contrast, one definition of manslaughter under La. R.S. 14:31(A)(1) is a homicide which would be murder under either Section 30 (first degree murder) or Section 30.1 (second degree murder), but the offense is committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Provocation shall not reduce a homicide to manslaughter if the jury finds that an offender's blood had actually cooled, or that an average person's blood would have cooled, at the time the offense was committed.
The evidence in the record is sufficient to support the defendant's conviction for second degree murder. As pointed out by the State, the testimony of Wyman, Albritton, and Sullivan indicates that Woods was not provoked by anyone in the Sullivan home into committing the crimes. These witnesses all indicated that Woods was confronted about his behavior and was asked to leave, that Julie Woods did not agree to leave with her husband, that Woods was the aggressor, and that the actions of the others present were defensive. Woods himself admitted to becoming excited and loud while talking to his wife. The dispute as to whether Wyman armed himself should be resolved in the light most favorable to the prosecution. Furthermore, there is Woods' admission that he was angry on the night before the crime, and that he even "joked" that he had stabbed his wife. Additionally, there is no dispute that he had armed himself with a knife before going to Sullivan's house, even though he claimed it was for protection against drug dealers.
Considering all the evidence in the light most favorable to the prosecution, the jury easily could have concluded that Woods had the specific intent to stab his wife with a knife if she refused to return home with him from Sullivan's house. Furthermore, when viewing the evidence in the light most favorable to the prosecution, the jury also could have reasonably concluded that Woods failed to establish that the killing was committed in sudden passion or heat of blood immediately caused by provocation sufficient to deprive an average person of his self-control and cool reflection. Woods had been angry at his wife the night before the killing, rather than first becoming angry immediately before the attacks. Even if a jury might have considered Woods' knowledge of his wife's alleged offer to sell herself for crack as being sufficient to deprive an average person of self-control, the jury also reasonably could have concluded that he regained his self-control by the next day.
Excessive Sentence
The defendant argues that he received an excessive sentence on count two, the aggravated battery of Keith Wyman for which Woods was sentenced to 10 years at hard labor. Woods asserts that he had no felony convictions and no history of violent crime, that Wyman's injury was not life threatening, and that Wyman's actions and interference with Woods' marriage precipitated the incident. According to Woods, a sentence in the mid-range or on the lower side, rather than the maximum, would have been more appropriate.
In contrast, the State points out that the trial court has broad discretion to sentence within the statutory limits, and that this is particularly true when the offense involves violence against the victim's person. The State notes that Woods was an uninvited guest who was asked to leave on several occasions, that he introduced a weapon into the encounter where no one else was armed, that Woods did not know Wyman, who had stepped in to prevent an altercation, and that Wyman needed 79 stitches as a result of the cut which severed his *668 saliva gland, tendon, and muscles, resulting in Wyman suffering from occasional dry mouth and permanent disfigurement. The State also points out that the trial judge sentenced Woods to far less than the maximum on the attempted manslaughter involving Sullivan and that the trial judge took the overall circumstances of the defendant's actions into account when he sentenced Woods on the aggravated battery count. Additionally, the State points out that the trial judge noted the defendant's abuse of alcohol and drugs, and that the defendant had admitted at trial that he spent three days prior to the victim's death drinking and consuming cocaine. Finally, the State argues that it is obvious from the sentence imposed that the mitigating factors were taken into consideration, that the trial court referred to the defendant's testimony indicating how much he loved the victim, and that the court had received letters on the defendant's behalf.
Under the provisions of La. R.S. 14:34, aggravated battery is a battery committed with a dangerous weapon. Whoever commits an aggravated battery shall be fined not more than five thousand dollars, imprisoned with or without hard labor for not more than ten years, or both.
The test imposed by the reviewing court in determining the excessiveness of a sentence is two-pronged. First, the record must show that the trial court took cognizance of the criteria set forth in La. C. Cr. P. art. 894.1. The trial judge is not required to list every aggravating or mitigating circumstance so long as the record reflects that he adequately considered the guidelines of the article. State v. Smith, 433 So.2d 688 (La.1983); State v. Dunn, 30,767 (La.App.2d Cir.6/24/98), 715 So.2d 641. The articulation of the factual basis for a sentence is the goal of La. C. Cr. P. art. 894.1, not rigid or mechanical compliance with its provisions. Where the record clearly shows an adequate factual basis for the sentence imposed, remand is unnecessary even where there has not been full compliance with La. C. Cr. P. art. 894.1. State v. Lanclos, 419 So.2d 475 (La.1982); State v. Hampton, 38,017 (La. App.2d Cir.1/28/04), 865 So.2d 284, writs denied, XXXX-XXXX (La.3/11/05), 896 So.2d 57 and 2004-2380 (La.6/3/05), 903 So.2d 452. The important elements which should be considered are the defendant's personal history (age, family ties, marital status, health, employment record), prior criminal record, seriousness of the offense, and the likelihood of rehabilitation. State v. Jones, 398 So.2d 1049 (La.1981); State v. Haley, 38,258 (La.App.2d Cir.04/22/04), 873 So.2d 747, writ denied, 2004-2606 (La.06/24/05), 904 So.2d 728.
A sentence violates La. Const. art. 1, § 20 if it is grossly out of proportion to the seriousness of the offense or nothing more than a purposeless and needless infliction of pain and suffering. State v. Smith, 2001-2574 (La.1/14/03), 839 So.2d 1; State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Bonanno, 384 So.2d 355 (La.1980). A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, XXXX-XXXX (La.1/15/02), 805 So.2d 166; State v. Lobato, 603 So.2d 739 (La. 1992); State v. Hogan, 480 So.2d 288 (La. 1985); State v. Bradford, 29,519 (La. App.2d Cir.4/2/97), 691 So.2d 864.
The trial court has broad discretion to sentence within the statutory limits. State v. Black, 28,100 (La.App.2d Cir.2/28/96), 669 So.2d 667, writ denied, 96-0836 (La.9/20/96), 679 So.2d 430. Absent a showing of manifest abuse of that discretion, we may not set aside a sentence as excessive. State v. Guzman, 99-1528, 99-1753 (La.5/16/00), 769 So.2d 1158.
As a general rule, maximum or near maximum sentences are reserved for *669 the worst offenders and the worst offenses. State v. Robinson, 36,147 (La.App.2d Cir.12/11/02), 833 So.2d 1207; State v. Adger, 35,111 (La.App.2d 9/26/01) 797 So.2d 146.
Contrary to appellant counsel's arguments, the sentencing transcript clearly shows that the trial judge did adequately comply with Article 894.1 and provide a factual basis for the sentence imposed for aggravated battery. The trial judge considered Wood's criminal history, his alcohol and drug problems, and the letters submitted on Woods' behalf. Furthermore, although the trial judge initially indicated that he was going to sentence Woods on the two lesser offenses without regard to the homicide, when Woods' counsel asked for reconsideration because Woods received the maximum sentence on the aggravated battery, the trial judge stated "this is one instance where I'm not consistent in what I say." The judge then indicated he was imposing the maximum sentence for the aggravated battery "because I consider the fact the same conduct resulted in the death of his wife."
Next, we note that Woods initially was charged with attempted second degree murder of Wyman, but the jury returned the verdict of aggravated battery instead. Furthermore, this particular aggravated battery falls within the category of the worst offenses because it was part of a criminal incident in which another individual was murdered and a third nearly died.

CONCLUSION
For the reasons expressed more fully above, we affirm the defendant's convictions and sentences.
AFFIRMED.