SEXTON, Judge Pro Tem.
| defendant, Glenn Anthony Foster, was convicted of vehicular homicide. La.R.S. 14:32.1. He was subsequently sentenced to 30 years’ imprisonment at hard labor and to a fíne of $15,000. Defendant now appeals. For the reasons stated herein, Defendant’s conviction and sentence are affirmed.
FACTS
On December 18, 2009, the state filed a bill of information charging Defendant, Glenn Anthony Foster, with vehicular homicide in violation of La. R.S. 14:32.1. Specifically, the bill, as amended on February 7, 2011, charged that, on November 3, 2009, Defendant did kill Carrie Lea Jones while engaged in the operation, or actual physical control, of a motor vehicle while under the influence of alcoholic beverages. Defendant’s trial before a jury commenced on February 8, 2011.
The state’s first witness was Joyce Terry, a 911 dispatcher who testified that, on November 3, 2009, a call came in from an individual identifying himself as Glenn Foster. Terry identified the tape recording of the call which was played for the jury. In the recording, the caller is heard asking the dispatcher if he could speak to Sergeant Stacy Cowgill, whom the caller identifies as a neighbor of his. The dispatcher is heard telling the caller that Cowgill is out on a call. When the dispatcher asks if there is anything she could assist him with, the caller states that his wife is dead out by the pond. The dispatcher is then heard contacting Sergeant Cowgill and patching the caller through to him.
| gSergeant Cowgill testified that, on the afternoon of November 3, 2009, he was contacted by dispatch and informed that a caller identifying himself as Defendant had asked to speak to him. Being familiar with Defendant and his penchant for drinking, Cowgill initially declined the call. The dispatcher then recontacted Cowgill and informed him that Defendant was claiming that his wife was dead. Cowgill decided to take the call, a recording of which was played for the jury. In the recording, Defendant says that his wife had woken up at around daybreak and said she was going over to “dad’s” house to drink a couple of beers. Defendant woke up about an “hour or two” before the call and found his wife’s van stuck “over there by the pond” and his wife “laying [sic] there by the front door.” Defendant states repeatedly that he is certain his wife is dead. After Defendant tells Cowgill that he is currently at “dad’s” house, the two agree to meet at Defendant’s residence before ending the call.
After the tape was played, Cowgill testified that he proceeded to Defendant’s home after ending the call. Having known Defendant as a chronic drinker with a penchant for fabrication, Cowgill advised the dispatcher to put the detective’s office and crime scene investigators on standby until he could determine whether their response to the scene was warranted. Cow-gill arrived at Defendant’s mobile home on Buffalo Road in Ida, Louisiana, which he described as being approximately 200 yards off the road. When he arrived, Cowgill observed Carrie Jones’ body lying *223 in the front yard just in front of a wooden landing at the foot of the steps leading down from the front door of the mobile home. He checked for a pulse in Rboth a carotid and a radial artery and found none. He then checked for rigor mortis and found no signs of it. He observed that the victim was wearing a pair of sweatpants, which were pulled down to her pubic area, that she had a little bit of blood on her chin and that she had some scratches on one of her hips.
Cowgill testified that Defendant was sitting on the front steps and had a strong odor of alcohol. He was slurring fiis speech and was unsteady on his feet. Afterward Cowgill was joined on the scene by Corporal Anderson and Defendant was placed in the back of Anderson’s patrol unit. Cowgill and Anderson then walked to a van sitting next to a pond about 100 yards in front of the mobile home; Cowgill noted that the van appeared to be stuck in mud. Anderson also took the stand and testified that, upon his arrival, he was able to observe Defendant. He detected a strong odor of alcohol on Defendant and noticed his speech to be slurred.
A series of crime scene photographs was also shown to the jury. In addition to depicting the residence and its surroundings on November 3, 2009, photographs of the victim show the body of a white female lying on the grass just in front of a wooden landing. The victim is wearing a sleeveless blue shirt, which is pulled up to just under her breasts, and purple sweatpants pulled down below her waist. Her chin and left cheek appear to be stained with blood. Her feet are bare and a close-up of her right foot shows scratches on the top of her mid-and forefoot and one of the toes. There are also pictures of a blue Chrysler van, the front wheels of which are sitting in mud trenches which extend several feet in front of the van. ^Several of the crime scene investigators testified at trial that it appeared the vehicle had been driven to where the trenches end and then backed up to the location where it is depicted in the photographs. The photographs also depict a white Toyota pickup truck, which investigators testified was parked just a few feet away from the victim’s body. Pictures of the interior of the truck show a can of beer lying in the front seat and red staining on the passenger side headrest.
Dr. Long Jin, a forensic pathologist, testified that he performed the autopsy on Jones’ body and concluded that the cause of death was “traumatic asphyxia due to crush/squeeze injuries of the chest” with an “extreme high level of ethanol” being a contributory factor. Dr. Jin explained that his conclusion that the victim had suffered “crush/squeeze injuries” leading to asphyxia came from the injury pattern on Jones’ body. The pattern included a fractured right clavicle, 16 fractures to the ribs on her right side, 9 fractures to the ribs on her left side and blood in her chest cavity. Jones also had a small hemorrhage on the white of her right eye, which Dr. Jin explained can happen when the chest is compressed because it prevents blood flow, causing pressure to build and small blood vessels to possibly “bust.” Jones also had a fractured pubic symphy-sis and L-4 vertebrae, both bones which Dr. Jin testified would not likely have broken absent some outside force or pressure being applied. Dr. Jin also asserted that, because of the clinical history of a seizure disorder, he checked the victim and found no signs that she had suffered a seizure.
LAs to the “extreme high level of ethanol” in the victim’s blood, Dr. Jin testified that he listed it as a contributory factor in her death because alcohol inhibits brain function and, therefore, would have exacerbated the breathing difficulties that result *224 ed from the chest compression. Dr. Jin also stated that, depending on the circumstances surrounding the injuries inflicted on Jones, the high level of alcohol in her system could have limited her ability to defend herself. Dr. Jin noted that the deceased had a fatty liver, which he testified was a sign of chronic alcoholism. In addition, Dr. Jin testified that, in his medical opinion, the .412 blood alcohol level found in the victim would not be fatal to a chronic alcoholic. To the contrary, Dr. Jin opined that chronic alcoholics, though impaired, can actually be functional despite such an elevated level.
Dr. Todd Thoma, the coroner for Caddo Parish, testified that his investigation into the cause of Jones’ death included examination of the body at the scene and a review of the autopsy report issued by Dr. Jin. Dr. Thoma recalled that the location and appearance of the body at the scene looked as though it had been placed there, perhaps after being dragged. After noting that Jones’ body was lying in an unnatural position, her top pulled up and her pants partially pulled down, with multiple bruises and contusions, Dr. Thoma concluded that an autopsy was warranted. He also indicated that, while liver temperature was taken to narrow the time of death, the lack of rigor mortis and fixed lividity indicated that the death had occurred within the previous 12 hours and was consistent with the time at which the death was first reported to authorities. After examining the l^autopsy results, Dr. Thoma concluded and noted on the death certificate that the cause of death was “traumatic asphyxia” and “crush/squeeze injuries to the chest.” As to the death certificate’s listing of “Ethanol Abuse” under the cause of death section, Dr. Thoma stressed that he had in-eluded it under the section entitled “other significant conditions contributing to the death, but not resulting in the underlying cause” because he did not believe alcohol to be the actual cause of death, but as a respiratory depressant could have aggravated Jones’ inability to breath resulting from the crush injuries. He also expressed his opinion that, because she was an alcoholic, the elevated level of ethanol in Jones’ system would not have been fatal to her.
Defendant gave four post-Miranda recorded statements to officers, the first of which was made on the evening of November 3, 2009, the day the victim died. During this initial statement, Defendant claimed, as he had to Cowgill earlier, that he had discovered Jones’ dead body just off the landing shortly after waking up that day. Specifically, Defendant asserted that Jones woke him up at around daybreak and told him she was going over to Defendant’s father’s home to drink. Defendant woke up at approximately 10:00 o’clock in the morning and, seeing that Jones had not returned, drank some coffee and smoked a cigarette. Defendant alleged that he then got up and walked out the door to let the dog relieve itself and discovered Jones’ body. He denied moving her body, knowing how long it had been there or knowing why the victim’s van was sitting alongside the pond. He stated that the path in which the van had been traveling did not lead anywhere. He 17said that he then drove to his father’s house to use the phone[1] to call Stacy Cowgill. He could not explain why his call to Cowgill was not placed until approximately 2:30 p.m. An additional noteworthy event during the first interview came during a break when the interviewing offi *225 cer brought Defendant some coffee and Defendant made a move for the officer’s sidearm.
In a subsequent interview the following morning, prior to which he was again advised of and waived his Miranda rights, Defendant began by insisting that he had discovered Jones’ body and briefly attempted CPR before going to his father’s home to call authorities. As officers revealed more information about the physical evidence, including the suspected blood in his truck and the injuries suffered by the victim, Defendant conceded that he had found Jones by the pond and may have run over her. Shortly thereafter, he admitted that, after he woke, he drank two “pretty good-sized bourbons and Cokes” and then, seeing Jones’ van by the pond, he got in his truck to go look for her. He stated that, in the process of doing so, he ran over Jones who was lying in the bushes. Defendant stated that he loaded her in his truck and brought her back to their home and laid her next to the porch. He said she was not dead when he loaded her in the truck; she was talking, although Defendant never stated what Jones allegedly said. During further questioning, Defendant denied being in an argument with Jones, chasing her down with his truck or even being able to see her before |she ran over her. Defendant admitted that he was “legally intoxicated,” “drunk,” “inebriated,” at the time he ran over Jones, yet he repeatedly denied that he did so intentionally. Toward the conclusion of the interview, Defendant agreed to go with detectives to his residence to walk them through the events of the previous day.
During the videotaped visit to Defendant’s home, Defendant is observed walking officers through his version of the events starting at the time he opened his front door and noticed the van sitting near the pond. Specifically, he claimed that he got in his truck and upon noticing that the keys were not in it, went back inside the house to look for them. He claimed he could locate only his spare key, which he used to start the truck. Defendant then walked officers the relatively short distance to where the van was located and showed them the area where he claimed Jones was lying when he ran over her. He claimed he heard Jones make a “groaning” or “grumbling” sound before he picked her up and loaded her in his truck. He admitted that, either before or after loading her in the truck, he went to the van to look for his keys, but only briefly, since he had more pressing concerns. He then drove Jones back to the house where he deposited her body on the spot where authorities found it. Defendant then claimed he went inside briefly to get a drink before returning and trying CPR on Jones. When he concluded she was dead, he drove to his father’s house to call Stacy Cowgill. He admitted during the interview that it was possible he had brought his vehicle to a stop on top of the victim, although he had no specific recollection of it due to the fact that he was “pretty snockered” at [9the time of the incident. While at his home, Defendant also showed officers a sizable mug from which he claimed he had been drinking and an empty half-gallon bottle of bourbon lying on the floor, which he identified as the one he had been using to make his drinks.
When they returned to the police station, ■ Defendant gave yet another statement during which he said that the more he thought about it, he remembered that he had gotten in the van with the intent of driving around his property and ran over Jones while driving next to the pond. He placed her body in the van with the intent of driving her back to the house, but the van got stuck. He then retrieved his truck and moved her into the truck. During the interview, he also admitted that, when he *226 first woke up that morning, he had a drink before returning to bed and then another two large mugs of bourbon and Coke right before he got in the van to drive around the property. Defendant had no explanation for why the victim would have been lying down in the weeds by the pond.
The jury returned a verdict of guilty as charged and Defendant’s sentencing was scheduled for February 23, 2011. Prior to sentencing, the state presented a presen-tencing memorandum to which it attached various police reports regarding Defendant’s prior arrests, including three detailing violence against Jones. The worst incident took place in 2006 when it appears that Jones was trying to leave Defendant with their minor child. Defendant threatened to kill the victim and grabbed her by the throat and threw her on the bed. He then got on top of her and punched her in the face, as evidenced by two black eyes observed by the responding officer. | mDefendant, as with most other incidents involving his arrest, then proceeded to make threats to the arresting officer. Other conduct reflected in the reports supplied by the state include drug crimes, driving under the influence and numerous threats made to various people including Jones, her mother and her ex-husband.
At the sentencing hearing, the state presented the testimony of William Jones, the victim’s brother, Bryan Keir, her ex-husband, and Linda Haydel, a court-appointed special advocate assigned to monitor Defendant and the victim when their eldest daughter was removed from the home by social services. The victim’s brother testified that his sister’s relationship with Defendant was marred by physical abuse. He had been called on various occasions to come pick his sister up after incidents of abuse and had observed her with bruises and missing chunks of her hair. He also indicated that Defendant had threatened to kill him and his mother.
Keir testified that he and Jones divorced in 2005, but that he had tried to help her on several occasions after she started her abusive relationship with Defendant. One of the incidents he recalled also involved Defendant running over Jones with a vehicle. In that instance, her leg was broken and required surgery. At one time, Keir testified that he had helped seclude Jones for two weeks in a motel. During that time, Jones told him that Defendant had once tried to punch her while she was holding her daughter, but ended up punching the child in the face instead.
Haydel testified that she was the court-appointed special advocate who reported to the juvenile court on behalf of the minor children of ¡^Defendant and Jones. She testified that both Defendant and Jones had substance abuse issues. Defendant, however, had appeared intoxicated at one of the children’s Christmas parties organized by CASA and had to be ejected. Haydel also reported that once, when Defendant got upset with her, he called her on the phone and told her he was going to “cut [her] up in little pieces and throw [her] in the Red River.” Haydel had also witnessed the victim after she had received a beating from Defendant and witnessed a black eye, swollen face and red markings on her face and arms.
At the conclusion of the hearing, the court listed the various pertinent factors it considered in reaching a sentence, including that Defendant’s conduct manifested deliberate cruelty to Jones. While Defendant was tried on a vehicular homicide charge, the court indicated its belief that Defendant’s conduct was not accidental. The court also listed as aggravating factors the fact that Defendant took advantage of his victim’s vulnerability resulting from intoxication, his use of a deadly weap *227 on and the fact that he had subjected Jones to severe domestic abuse over an extended period of time. The court noted the lack of regard for Jones exhibited by Defendant’s failure to notify authorities of her condition for several hours and his repeated attempts to escape culpability through his lack of candor and ever-changing versions of the events which led to Jones’ death.
The court found that no mitigating factors were evident and sentenced Defendant to the maximum term of 30 years’ imprisonment, without the benefit of probation, parole or suspension of sentence, and a $15,000 fine. A motion to reconsider sentence making a bare claim of excessiveness was 112filed on February 28, 2011, and was denied on March 3, 2011, without a hearing. This appeal ensued.
DISCUSSION
Assignment of Error Number One (verbatim.): The evidence was insufficient to support the verdict of vehicular homicide.
Defendant argues that the evidence of his intoxication at the time the victim was killed was “conflicting” given the absence of any blood alcohol tests and the uncertainty as to the Jones’ time of death. He further argues that Jones’ intoxication and history of seizures could not be ruled out as causes of death.
The state argues that Defendant’s repeated admissions to being intoxicated when he ran over Jones and corroborating witness testimony were sufficient to prove that he was under the influence of alcoholic beverages when he killed Jones while operating a motor vehicle. The state also argues that, despite Defendant’s assertions to the contrary, the testimony of Dr. Jin and Dr. Thoma did rule out alcohol poisoning or seizures as causes of Jones’ death.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Carter, 42,894 (La.App.2d Cir.1/9/08), 974 So.2d 181, writ denied, 08-0499 (La.11/14/08), 13996 So.2d 1086. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. State v. Pigford, 05-0477 (La.2/22/06), 922 So.2d 517; State v. Dotie, 43,819 (La.App.2d Cir.1/14/09), 1 So.3d 833, writ denied, 09-0310 (11/6/09), 21 So.3d 297. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Smith, 94-3116 (La.10/16/95), 661 So.2d 442. A reviewing court accords great deference to a jury’s decision to accept or reject the testimony of a witness in whole or in part. State v. Eason, 43,788 (La.App.2d Cir.2/25/09), 3 So.3d 685, writ denied, 09-0725 (La.12/11/09), 23 So.3d 913; State v. Hill, 42,025 (La.App.2d Cir.5/9/07), 956 So.2d 758, writ denied, 07-1209 (La.12/14/07), 970 So.2d 529.
La. R.S. 14:32.1 provides in pertinent part:
A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following *228 conditions exists and such condition was a contributing factor to the killing:
[[Image here]]
(4) The operator is under the influence of alcoholic beverages.
A conviction for vehicular homicide requires proof that an offender caused the death of another human being while engaged in the operation of a motor vehicle and a contributing factor to the killing was the offender’s being under the influence of alcoholic beverages. In the case sub judi-ce, the evidence is overwhelmingly sufficient to establish Defendant’s guilt. Over | uthe course of several hours of interviews admitted into evidence, Defendant made many inconsistent statements regarding his actions on the day of Jones’ death. One fact about which he was remarkably consistent, however, was that he was “legally intoxicated,” “drunk,” “inebriated” and “pretty snockered” at the time that he ran over Jones with either his truck or his van. He also elaborated as to how he got that way by telling officers that he drank two mugs filled with bourbon and Coke just before getting into the van. Once at his house, Defendant showed the officers the sizable mug he had been referring to and the empty half-gallon jug of Kentucky Deluxe Bourbon. Defendant’s incriminating statements were corroborated by the observations of officers who first arrived on the scene and found Defendant reeking of alcohol and slurring his speech.
As to whether Jones’ death could have been caused by seizures or alcohol poisoning, there was no evidence that the victim suffered a seizure immediately preceding her demise. Dr. Jin testified that her body bore none of the signs which could indicate that the victim had died as a result of a seizure. He and Dr. Thomas both testified that it was unlikely that even the extremely elevated level of ethanol in her system would have caused her death, because she was a chronic alcoholic. In short, both Dr. Jin and Dr. Thoma stated conclusively that, in their expert opinion, the cause of death was asphyxia as a result of Jones’ chest being crushed.
Despite Defendant’s assertions to the contrary, there was no conflicting testimony regarding his intoxication; and, while there is plenty of evidence that Jones died as a result of being crushed by a heavy object, 1 ¶ a there is no affirmative evidence that she died from a seizure or as a result of her elevated blood alcohol level. This assignment is without merit.
Assignment of Error Number Two (verbatim): The court erred by imposing an excessive sentence.
Defendant states conclusively, with no elaboration, that the trial court erred by imposing the maximum sentence allowable under law. We disagree.
Since Defendant’s motion for reconsideration merely alleged that the sentence is excessive, under State v. Mims, 619 So.2d 1059 (La.1993), he is “simply relegated to having the appellate court consider the bare claim of excessiveness.” This bare claim preserves only a claim of constitutional excessiveness, Mims, supra; State v. Lofton, 41,423 (La.App.2d Cir.9/27/06), 940 So.2d 702, writ denied, 06-2952 (La.9/28/07), 964 So.2d 359. Constitutional review turns upon whether the sentence is illegal, grossly disproportionate to the severity of the offense or shocking to the sense of justice. State v. Livingston, 39,390 (La.App.2d Cir.4/6/05), 899 So.2d 733; State v. White, 37,815 (La.App.2d Cir.12/17/03), 862 So.2d 1123.
In selecting a proper sentence, a trial judge is not limited to considering only a defendant’s prior convictions, but may properly review all prior criminal activity. State v. Pamilton, 43,112 (La. *229 App.2d Cir.3/19/08), 979 So.2d 648, writ denied, 08-1381 (La.2/13/09), 999 So.2d 1145; State v. Boyte, 42,763 (La.App.2d Cir.12/19/07), 973 So.2d 900, writ denied, 08-0175 (La.6/20/08), 983 So.2d 1272. The sources of information relied upon by the sentencing court may include evidence | ^usually excluded from the courtroom at the trial of guilt or innocence, e.g. hearsay and arrests, as well as conviction records. State v. Myles, 94-0217 (La.6/3/94), 638 So.2d 218. These matters may be considered even in the absence of proof the defendant committed the other offenses. State v. Doyle, 43,438 (La.App.2d Cir.8/13/08), 989 So.2d 864.
As a general rule, maximum or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Cozzetto, 07-2031 (La.2/15/08), 974 So.2d 665; State v. McKinney, 43,061 (La.App.2d Cir.2/13/08), 976 So.2d 802; State v. Woods, 41,420 (La.App.2d Cir.11/1/06), 942 So.2d 658, writ denied 06-2768 (La.6/22/07), 959 So.2d 494, and writ denied, 06-2781 (La.6/22/07), 959 So.2d 494; State v. Grissom, 29,718 (La.App.2d Cir.8/20/97), 700 So.2d 541.
Vehicular homicide is punishable by imprisonment “with or without hard labor for not less than five years nor more than thirty years” and mandatory statutory restrictions of “[a]t least three years of the sentence of imprisonment ... imposed without benefit of probation, parole, or suspension of sentence.” The statute also mandates a fine of “not less than two thousand dollars nor more than fifteen thousand dollars.” Additionally, the sentencing provision requires the court to order participation in a court-approved substance abuse program. La. R.S. 14:32.1(B).
Here, Defendant received the maximum sentence allowed under the law and we find no manifest abuse of discretion in this sentence. The crime of conviction clearly reflects only that conduct to which Defendant was willing to admit. The physical evidence combined with Defendant’s history 117with Jones strongly suggests that his conduct was not only more serious, but cruel. Moreover, Defendant’s conduct in the wake of Jones’ death was callous and nonsensical in his version of events and, aside from the suspicions it raises about what actually happened to Jones, at the very least it renders Defendant one of the worst offenders.
After claiming to have accidentally run over his live-in girlfriend, Defendant claimed that she was still alive. Yet instead of seeking help, he loaded her into his vehicle and drove her to the house where he dumped her body at the front stoop and went inside to have a drink. He then briefly tried CPR on her and then waited an extended period of time before driving to his father’s home to call the authorities.
When considering this conduct combined with Defendant’s repeated and severe physical abuse of Jones, we find that Defendant’s sentence is not so grossly disproportionate to the severity of his crime as to shock the sense of justice. The sentence is not a needless imposition of pain and suffering.
For the foregoing reasons, we find that Defendant’s sentence is not excessive; and, therefore, this assignment of error is without merit.
ERROR PATENT
The sentencing provisions require the court to order participation in a court-approved substance abuse program, which was not imposed in this case. This Court may recognize an illegally lenient sentence on its own. La. C. Cr. P. art. 882. Although the omission of the imposition of *230 participation in a court-approved substance abuse program was error, we [18refrain from amending Defendant’s sentence or remanding for resentencing because the state did not object at sentencing nor on this appeal.
CONCLUSION
For the foregoing reasons, the conviction and sentence of Defendant, Glenn Anthony Foster, are affirmed.
AFFIRMED.

. Defendant stated during the interview that he did not have a cell phone or a land line. When a distinct cell phone alert is heard in the interview room and the interviewing officer asks if it is the defendant's phone, defendant continues to deny having a cell phone.