PITMAN, J.
| defendant Raymond “Bubba” Casaday appeals his conviction for conspiracy to distribute methamphetamine and sentence of 15 years’ imprisonment at hard labor. For the reasons stated herein, we affirm Defendant’s conviction and sentence.

*582
FACTS

Defendant was charged with conspiracy to distribute a Schedule II Controlled Dangerous Substance methamphetamine in Bienville Parish, Louisiana, a violation of La. R.S.14:26 and 40:967(A)(1). A jury trial was held February 19-21, 2013, at which the following evidence was adduced and procedural issues arose.
Bienville Parish Sheriffs Office (“BPSO”) Sgt. Chris Davis testified that, on November 2, 2009, he and Mike Row-lan, a civilian and former police sergeant working undercover for the BPSO, arranged for Sgt. Rowlan to purchase methamphetamine from Ms. Tenia “Dee Dee” Matthews Kelley (“Kelley”).
Sgt. Rowlan and Kelley communicated by phone and arranged a meeting. At approximately 3:00 or 3:30 p.m., Sgt. Davis and another BPSO deputy, Lt. John Micah Crawford, parked their unmarked car near a convenience store in Jamestown, Louisiana, while Sgt. Rowlan parked in another nearby lot. When Kelley arrived in her truck, she pulled in next to Sgt. Rowlan and he gave her money to buy methamphetamine. After the transfer of the money, Kelley drove away to the north.
At about 6:00 p.m., Sgt. Davis and Lt. Crawford traveled north on the same road and observed Kelley’s vehicle at the home of Defendant, which pwas about a mile away from the meeting place. Sgt. Davis and Lt. Crawford returned to the convenience store to wait. Sgt. Davis testified that several hours elapsed before Kelley returned to meet Sgt. Rowlan, and she did so in a different vehicle. After Kelley met Sgt. Rowlan and left the meeting place, Sgt. Davis and Lt. Crawford met with Sgt. Rowlan and retrieved an envelope that Kelley had given him containing a baggie full of methamphetamine.
Kelley testified about her ■ role in the transaction, stating that Sgt. Rowlan had contacted her about buying some methamphetamine, so she called Defendant and his wife, Janice McWilliams (“McWilliams”). Kelley testified that “Bubba told me that yeah, he could — he could handle that for me.” She stated that she did not know Sgt. Rowlan was working for the BPSO when she met him in Jamestown. Sgt. Rowlan told her that he wanted an “eight ball,” or 3½ grams, of methamphetamine. She testified that she took money from him and drove a mile to a mile and a half to “Bubba and Janice’s house” and gave Defendant the money, after which he was to obtain the drugs and bring them back to her.
Kelley stated that she stayed at Defendant’s home while he was gone to get the drugs “three to four hours.” She said that Defendant told her “the first that he had come up on was no good, that he was having to wait for — for them to go get some that was. That one wasn’t no good.” Kelley further stated that the people present at Defendant’s home during these events were herself, Defendant, McWil-liams, and McWilliams’s daughter, Samantha, and son Jesse. Later that evening, two of Jesse’s friends stopped by. She | ¡.testified that, when Defendant returned home, he went with McWilliams into a bedroom, closed the door and then came back out and gave her the drugs in “a little clear zip up thing” that she put into an envelope. She further stated that, when she drove back to Jamestown to meet Sgt. Rowlan and give him the drugs, she used a car owned by Defendant’s family to drive because the car was for sale and she was considering buying it.
Kelley also testified that she sold methamphetamine to Sgt. Rowlan a total of four times and admitted that, as a result of these transactions, she had been charged with four counts of distribution of methamphetamine. Prior to Defendant’s trial, she *583 pled guilty to all four counts, receiving a sentence of ten years at hard labor, with all but one suspended and five years’ probation. She spent a year in jail and was on five years’ probation. She stated that she had not been promised anything by the district attorney’s office in exchange for her testimony in Defendant’s case.
BPSO Sgt. Mike Rowlan testified that, at the time of these events, he was retired from the Ouachita Parish Sheriffs Office and was working undercover for the BPSO on a “pay by the day” basis. He stated that, in furtherance of his undercover work, he contacted Kelley asking to buy $300 worth of methamphetamine, and she agreed to meet him in Jamestown. When they met, he gave her the money, whereupon she told him to wait there for her to get the drugs and she would deliver them to him. Sgt. Rowlan testified that he stayed at the meeting location from about 2:30 p.m. that afternoon until about 8:30 p.m. that night when Kelley returned. During this interval, he was texting and talking to Kelley, who [4was explaining to him that “they were having to get it” and that she was getting the drugs from a friend of hers in Jamestown who was a nurse and whose boyfriend worked offshore.
Sgt. Rowlan stated that, when Kelley returned, she was driving a different vehicle, which he subsequently learned was registered to the late husband of McWil-liams. He testified that Kelley told him that obtaining the drugs took a long time because “the meth that they had was not very good, and they had to wait for Mr. Casaday to go get some better meth.”
McWilliams (wife of Defendant), a former registered nurse, admitted that she had already pled guilty to conspiracy to distribute methamphetamine for her role in this incident. She testified that, on November 2, 2009, Kelley called her and asked if she knew where she (Kelley) could buy some methamphetamine. McWilliams told Kelley that she would check around and make some phone calls. Subsequently, Kelley came to her home to deliver some items and to visit her boyfriend, Chris Lee, who was also at McWilliams’s house at the time.
In her testimony, McWilliams denied that either she or Defendant sold methamphetamine to Kelley. She also testified that there was no methamphetamine in their house “until she [Kelley] got there.” She stated that she pled guilty to conspiracy to distribute methamphetamine “cause I carried it out further to see if she could get some. I did not distribute them to her, but according to [sic ] it was a conspiracy that we had discussed it.” McWil-liams further stated that, while Kelley was at her house, she (Kelley) “broke out ... her own supply and a pipe.”
IsMcWilliams also testified that Defendant was at the house that day until late that evening when he left to go to Minden to pick up some rugs from a store to cover newly installed plywood flooring in a bedroom. She stated that Defendant never delivered any drugs to Kelley that day.
Lt. Crawford testified that he was with Sgt. Davis in the unmarked car across from the location where Kelley met Sgt. Rowlan. He stated that they monitored what was happening via cell phone and that, at some point after Kelley left the meeting and during the five hours she was gone, they drove by Defendant’s home several times and saw her vehicle parked outside on each occasion that they passed by, but did not have the house under constant observation.
On cross-examination, Lt. Crawford admitted he had mistakenly testified at McWilliams’s preliminary examination that he’had constant surveillance on the resi *584 dence during these events; however, at Defendant’s trial, he stated that his testimony at the preliminary examination concerned a different date when deputies were watching Defendant’s residence.
After obtaining consent from Defendant and McWilliams, Sgt. Rowlan interviewed them together on January 7, 2010, with both Sgt. Davis and Lt. Crawford in attendance. Although this interview was recorded, the recording was destroyed in a fire at the facility where it was stored, so the jury was unable to hear it.
Concerning the interview, Sgt. Rowlan testified that he read both Defendant and McWilliams their rights before questioning them. Because both Defendant and McWilliams were present together at the interview, |fiSgt. Rowlan’s testimony about their joint statement frequently did not distinguish between them. Over Defendant’s objection, the trial court allowed the deputies to testify about the statement.[1] Sgt. Rowlan testified:
... that Ms. Mathews [Kelley] had came there with her three hundred dollars and that there was a man there named Jonathan Keiffer who had some methamphetamine but she didn’t want it because it wasn’t any good and she didn’t want to buy it from him to sell to me and that she waited while Mr. Casaday went to Minden — or Saline, I’m sorry— went to Saline following Keiffer to get some different meth to sell me and that they had returned and that Mr. Casaday had give it to ... Ms. Mathews who, in turn, sold it to me.
Lt. Crawford testified:
They said on that particular day that they had — I believe Janice McWilliams had set a deal up with Tenia Mathews for around three hundred dollars. When Tenia got there, there was an individual there that had the — the narcotics there, but that it was subpar. It was — it was not good quality. They then left — I think Bubba Casaday then left, went with this other individual to another location and got another quantity of narcotics and brought it back. And apparently, that was the reason for the long — long wait in the deal.
McWilliams denied most of Sgt. Row-lan’s and Lt. Crawford’s testimony about what she and Defendant told them in January 2010. She testified:
Q: [I]sn’t it true, that you explained, with your husband sitting there, that Tenia Mathews Kelley had made arrangement to purchase three hundred dollars worth of meth and that when she got there, Jonathan Keiffer was there, and the meth was, as y’all called it, subpar, and she refused it. And then your husband left and went to Saline to get something with more quality?
A: No, ma’am.
Q: You didn’t tell them that?
[A: No, ma’am. Jonathan Keiffer was never at my house that day. And I did not tell them that. I did tell them that she called looking for some meth.... And that she was wanting to buy, I think it was an eight ball she was wanting to buy at the time, which would have been about that amount of money. But no, I did not say that Jonathan Keiffer was there or that it was subpar and she refused it.
[[Image here]]
Q: And so, you didn’t tell them that Mr. Casaday left, went to Saline, *585 got some of better quality, came back and gave it to Ms. Mathews?
A: No, I did not. The only time he left was when he went to Fred’s with Chris.
Q: So when she left a little bit later on in your vehicle to go back to meet Sergeant Rowlan on November the 2nd ...
A: That was the second time she left from my house that day.
Q: Okay, but when she left in your vehicle, you didn’t know where she was going?
A: No, she asked to borrow my vehicle to [deliver a load of clothes].
Randall Robillard, the forensic chemistry supervisor at the North Louisiana Crime Lab, testified that the substance delivered to the lab for testing was methamphetamine; the testimony of the BPSO deputies identified that substance as the substance delivered by Kelley to Sgt. Row-lan.
After the state rested, Defendant called Samantha McWilliams to testify about the events of November 2, 2009. Samantha testified that, when she returned home after school that day, Defendant, her mother, her brother Jesse, Chris Lee, and Kelley were at the house installing a floor in a Isbedroom. She stated that she did not believe she left the home the entire evening. She testified that Defendant left that evening to go to Minden to buy some rugs and that he later returned to the house with the rugs. She stated she never saw Defendant, her mother or Kelley with drugs, nor did she hear them discussing drugs. She further testified that Kelley left and returned to their home twice that evening, all during the time period that Defendant was gone from the home.
Defendant’s other witness was Taylor Hodges, a friend of Jesse McWilliams. Ms. Hodges stated that she, “Bubba, Ms. Janice, Samantha, Jesse, my twin, Tyler, Bubba’s nephew, Chris, and Dee Dee” were present at the house that day. She testified that, at one point, Kelley left the house in her truck and then came back. She further testified that she did not see anyone with drugs at Defendant’s house or hear any conversation about drugs. She stated she left the home after Defendant went to Minden to get rugs.
The state had no rebuttal witnesses. The trial court addressed the Defendant’s request that it supply a jury instruction on specific intent as follows:
Specific intent is an essential element of a criminal conspiracy.
St. v. Hinton 6 So.3d 242
St. v. Carter 981 So.2d 734
St. v. Powell 968 So.2d 823
After reviewing the requested instruction, the trial court declined to include it, stating:
I agree with you [defense counsel], that specific intent is part of criminal conspiracy; however, I think the jury instructions I submitted to both you and Mrs. Jump indicate that — they had 19both criminal intent and specific intent — which I think is required by law to have both of them in the jury instructions. And my definition of specific intent is — specific intent is that state of mind which' exists when the circumstances indicate a defendant actively desired the prescribed criminal consequences to follow his act or failure to act. And on page four of the instructions, it says that it is un — when I give a definition. “The defendant in this case is charged with conspiracy to distribute schedule II controlled substance, to wit: methamphetamine.” It says it is unlawful for any person to knowingly and intentionally to conspire, so I would think, in my opinion, that that definition *586 of specific intent is within that definition of knowingly and intentionally to conspire. Therefore, I’m not going to add additional definition of specific intent is — an additional jury instruction to say specific intent is an element of criminal conspiracy because I think it is already in there. So, I’m — deny your ... request. ...
Defendant objected to the trial court’s ruling.
The next morning, counsel for Defendant submitted four additional suggested jury charges to the court. Those submissions were, as presented in writing:
1. A voluntary confession constitutes evidence only against a person making it. It must not be considered as evidence against an alleged co-defendant or alleged accomplice, it must be disregarded by the jury in determining the guilt or innocence of the alleged co-defendant or alleged accomplice. Blumenthal v. United States, 332 U.S. 539, 68 Sup.Ct. [S.Ct.] 248, 92 L.Ed.2d 154 [(1947)]; Krulewitch v. United States, 336 U.S. 440, 69 Sup.Ct. [S.Ct.] 716, 93 L.Ed.2d 790 [ (1949) ].
2. The jury should exercise extreme care and caution in receiving and weighing the testimony of an alleged accomplice. State v. Dehart [De Hart ], 109 La. 570, 33 So. 605 [(1903)]; State v. Robertson [196 La. 982], 200 So. 320 [(1941)].
3. Uncorroborated testimony of an alleged accomplice should be taken with great care and must bear on that part of the testimony which connects the alleged defendant with the alleged crime, and even then the jury should convict only after exercising extreme caution. State v. Hopper [114 La. 557], 38 So. 452 [ (1905) ]; State v. Bayonee [Bayonne ], 23 La.Ann. 78 [ (1871) ].
[in4. When a witness who is admittedly guilty and has confessed to his own guilt is produced by the State in an attempt to prove that the defendant is guilty and where such witness then proceeds to testify against the defendant he does what in popular language is called “turning State’s evidence.”
By his own testimony, he is what we call an accomplice. And I charge you that the testimony of an accomplice, testifying on behalf of the prosecution and against the defendant, should be received by you with suspicion and with the very greatest care and caution, and ought not to be passed upon by you under the same rules governing other and apparently credible witnesses.
If you find that any time before he is sentenced any such witness made statements or gave testimony in which he implicated defendant on trial, then you should take into consideration whether such statements or testimony implicating the defendant on trial were made under the promise or under the hope of leniency, for himself or for any member of his family, as a reward for implicating the defendant on trial.
And, in determining what weight, if any, to give to the testimony of such a witness, you should take into consideration whether he decided to testify, or give a statement, with the hope, for himself or any member of his family, or thereby avoiding prosecution altogether, or of obtaining a lighter sentence or a suspended sentence, or early parole, or any other form of leniency of favor. State v. Mitchell [258 La. 427], 246 So.2d 814 [ (1971) ], La. Sup.Ct., 1971.
The prosecutor objected to the late submission of these suggested jury charges, telling the trial judge that, if he was inclined to use the charges, the state would like to have additional time to find other *587 instructions. However, the state also argued that there was no need for the additional instructions because they were contained in the current jury charge.
The trial court discussed at length the timing of Defendant’s request for new jury charges and observed that the already-proposed charge had been provided to the parties the week before trial. Counsel and the trial |n court then discussed whether Defendant was made aware prior to trial that Kelley was going to testify that she bought drugs from Defendant.
The trial court addressed each of the four new proposed jury charges individually. It explained that the first charge was inapposite because it could not be determined whether the statements described in the cited cases were made by a codefen-dant at the same trial or at another proceeding. It rejected the remaining three proposed charges, stating that their substance, generally speaking, was already contained in the current jury charges. Defendant objected to the refusal to provide the charges.
After closing arguments, the trial court charged the jury with the law, including the following language:
As jurors, you alone shall determine the weight and credibility of the evidence. As the sole judges of the credibility of witnesses and the weight their testimony deserved, you should carefully scrutinize the testimony given and the circumstances under which the witnesses have testified. In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against either the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence.
A witness — the testimony of. a witness may be discredited by a showing that the witness previously was convicted of a crime. The conviction does not necessarily mean that the witness is failing to tell the truth. It is a circumstance you may consider, along with other evidence, in deciding whether you believe any or all of his or her testimony.
[[Image here]]
Criminal intent may be specific or general. Specific criminal intent is that state of mind which exists when the circumstances indicate that the defendant actively desired the prescribed criminal consequences to follow his act or his failure to act. General criminal intent is present when the circumstances indicate that the defendant must have adverted to the prescribed | ^criminal consequences as ... reasonably certain to result from his act or failure to act. A general criminal intent is always present when there is specific intent. Whether criminal intent is present must be determined in light of the ordinary experience. Intent is a question of fact which may be inferred from the circumstances. You may infer that the defendant intended the natural and probable consequences of his act.
Conspiracy is an agreement or combination of two or more persons for the specific purpose of committing a crime when, in addition, one or more of the parties to the agreement or combination does an act in furtherance of the [object] of the agreement or combination.
The defendant in this case is charged with conspiracy to distribute schedule II controlled dangerous substance, in this case methamphetamine. It is unlawful for a person knowingly and intentionally to conspire to distribute methamphet *588 amine. Distribute means to deliver, whether by physical delivery, administering or subterfuge. Thus, in order to convict the defendant of conspiracy to distribute methamphetamine, you must ... find (1) that the defendant entered into an agreement or combination to commit a crime with another person and (2) that the specific purpose of the agreement or combination was to commit the crime of distribution of methamphetamine and (3) that one of the parties did an act in furtherance of the object of the agreement or combination.
After deliberation, the jury convicted Defendant as charged with conspiracy to distribute methamphetamine by a 10-2 verdict.
On April 9, 2013, the trial court denied Defendant’s motions for post-verdict judgment of acquittal and new trial. The record does not reflect that a presentence investigation was ordered. In sentencing Defendant, the trial court stated:
After looking at the defendant’s record it looks like he was sentenced on 2/22/85 for a burglary in Texas and he’s got convicted of theft in Natchitoches Parish in 1986. He was sentenced in Texas on attempted capital murder, burglary of a motor vehicle and burglary of a building and then he’s got this. So considering-I think the range for conspiracy to distribute schedule II is anything from zero to fifteen. Because of his extensive record and the fact that from the testimony that was 1^presented by Ms. Kelley that basically the distribution was going on in his home where there were various children, teenage age, which concerns the Court also. Because of all of those factors the Court is going to sentence Mr. Casaday to a term of fifteen years with the Department of Corrections.
The record does not show that Defendant made a verbal motion to reconsider sentence, and no written motion to reconsider sentence or ruling is found in this record. Notably, the state filed a habitual offender bill against Defendant charging him as a fourth-felony habitual offender,[2] but the record does not indicate whether he was ever adjudicated a habitual offender or resentenced. Defendant filed a late motion for appeal, which was denied, but he later had his appeal rights reinstated on post-conviction relief. Defendant now appeals.

DISCUSSION

Sufficiency of the evidence

Defendant argues that the evidence presented at trial was insufficient to convict him of conspiracy to distribute methamphetamine. He contends that various conflicts between the testimony of the witnesses and alleged internal inconsistencies in some of the testimony exist and that the conflicts and inconsistencies render the evidence insufficient to support his conviction. In particular, Defendant points out the varying testimony about (1) who was at Defendant’s house, (2) the level of surveillance by the deputies, (3) the number of times Tenia Kelley left the house and what she did while she was gone, (4) who furnished the methamphetamine that | uKelley smoked, and (5) what Defendant and Janice McWilliams said to the deputies.
La. R.S. 40:967 provides, in part:
A. Manufacture; distribution. Except as authorized by this Part or by Part *589 VII-B of Chapter 5 of Title 40 of the Louisiana Revised' Statutes of 1950, it shall be unlawful for any person knowingly or intentionally:
(1) To produce, manufacture, distribute, or dispense or possess with intent to produce, manufacture, distribute, or dispense, a controlled dangerous substance or controlled substance analogue classified in Schedule II;
[[Image here]]
B. Penalties for violation of Subsection A. Except as provided in Subsection F, any person who violates Subsection A with respect to:
(1) A substance classified in Schedule II which is an amphetamine or methamphetamine ... shall be sentenced to a term of imprisonment at hard labor for not less than two years nor more than thirty years; and may, in addition, be sentenced to pay a fine of not more than fifty thousand dollars.
At the time of this offense, La. R.S. 14:26 provided, in part:
A. Criminal conspiracy is the agreement or combination of two or more persons for the specific purpose of committing any crime; provided that agreement or combination to commit crime shall not amount to a criminal conspiracy unless, in addition to such agreement or combination, one or more of such parties does an act in furtherance of the object of the agreement combination.
[[Image here]]
C. Whoever is a party to a criminal conspiracy to commit any other crime shall be fined or imprisoned, or both, in the same manner as for the offense contemplated by the conspirators; but such fine or imprisonment shall not exceed one-half of the largest fine, or one-half the longest term of imprisonment prescribed for such offense, or both.
State v. Powell, 42,540 (La.App.2d Cir.10/24/07), 968 So.2d 823, provides the law on conspiracy and states:
The elements of the crime of conspiracy are an agreement or combination of two or more persons for the specific purpose of committing a crime and an act done in furtherance of the object of the agreement or combination. An essential element of the crime of conspiracy is specific intent. Specific intent is defined as that state of mind which exists when the circumstances indicate that the offender actively desired the prescribed criminal consequences to follow the act or failure to act. Even though intent is a question of fact, it may be inferred from the circumstances of the transaction and the actions of the defendant. The existence of specific intent is an ultimate legal conclusion to be resolved by the trier of fact. The foundation of the offense is the combination of two minds for an unlawful purpose.
(Internal citations omitted.)
The overt act need not be unlawful; it may be any act, innocent or illegal, accompanying or following the agreement, which is done in furtherance of the object of the agreement. State v. Hampton, 38,017 (La.App.2d Cir.1/28/04), 865 So.2d 284.
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979); State v. Cummings, 95-1377 (La.2/28/96), 668 So.2d 1132. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the *590 appellate court with a vehicle to substitute its own appreciation of the evidence for that of the fact finder. The appellate court does not assess the credibility of witnesses or reweigh evidence. A reviewing court accords |16great deference to a jury’s decision to. accept or reject the testimony of a witness in whole or in part. State v. Gilliam, 36,118 (La.App.2d Cir.8/30/02), 827 So.2d 508, writ denied, 02-3090 (La.11/14/03), 858 So.2d 422; Powell, supra.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. State v. Allen, 36,180 (La.App.2d Cir.9/18/02), 828 So.2d 622, writs denied, 02-2595 (La.3/28/03), 840 So.2d 566, 02-2997 (La.6/27/03), 847 So.2d 1255, cert. denied, 540 U.S. 1185, 124 S.Ct. 1404, 158 L.Ed.2d 90 (2004). An appellate court reviewing the sufficiency of the evidence in such cases' must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. Id. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. Id.
Absent internal contradiction or irreconcilable conflict with the physical evidence, a single witness’s testimony, if believed by the fact finder, is sufficient to support a factual conclusion. State v. Marshall, 04-3139 (La.11/29/06), 943 So.2d 362, citing, State v. Legrand, 02-1462 (La.12/3/03), 864 So.2d 89. Credibility determinations are within the sound discretion of the .trier of fact and will not be disturbed unless clearly contrary to the evidence. Marshall, supra, citing, State v. Vessell, 450 So.2d 938 (La.1984). Where there is conflicting testimony about |17factual matters, the resolution of which depends upon a determination of the credibility of the witnesses, the matter is one of the weight of the evidence, not its sufficiency. State v. Allen, supra.
Careful review of the testimony shows that the various witnesses had different recollections of some of the details of the events of the day. Nevertheless, the record demonstrates that the state presented sufficient evidence to support Defendant’s conviction, largely through the testimony of Kelley and the deputies’ testimony regarding the statements made by Defendant and McWilliams during the investigation. Kelley testified that, when Sgt. Rowlan asked her to get him some methamphetamine, she contacted Defendant and McWilliams, stating “Bubba told me that yeah, he could-he could handle that for me.” Kelley also testified that, once she received the money for the drugs, she went to Defendant’s house, gave Defendant the money, and he was to get the drugs and bring them back to her. She stated that Defendant left and was gone for hours, telling her that “the first that he had come up on was no good, that he was having to wait for — for them to go get some that was.” . She further testified that, when Defendant returned, he and McWilliams went into a bedroom and thereafter came out and gave her methamphetamine in a clear package.
Kelley’s testimony shows that she and Defendant agreed and intended that he would procure and deliver methamphetamine to her. She also makes it clear that Defendant knew that the purpose of their transaction was the delivery of methamphetamine to her and that Defendant told her he had to seek a source for drugs of an acceptable quality because his first | ^supplier’s drugs were inferior. Finally, her testimony reflects that both she and Defendant engaged in several acts in fur *591 therance of the conspiracy and that, in particular, Defendant spent several hours trying to source the drugs.
Further, Sgt. Rowlan’s testimony regarding Defendant’s and McWilliams’s joint statement shows that they were aware Kelley did not want to buy the methamphetamine they had because it was not of a good enough quality for her to “buy it from him to sell to me.” Therefore, she waited at Defendant’s home while he went to Saline to get the higher quality methamphetamine.
Although the various witnesses had some differing versions of events and McWilliams’s testimony directly contradicted that of Kelley, nothing in the record shows that Kelley’s version of events was “clearly contrary to the evidence” in the manner required to undermine the jury’s choice to accept her testimony as true. The jury chose to credit Kelley’s testimony despite the possibility that she might have a motive to lie. That credibility determination was the province of the jury and does not present a question of the sufficiency of the evidence. This assignment of error, therefore, is without merit.

Jury instructions

Defendant argues that the trial court committed reversible error in failing to charge the jury with the five charges he requested during the trial. La. C. Cr. P. art. 807 provides:
The state and the defendant shall have the right before argument to submit to the court special written charges for the jury. Such charges may be received by the court in its discretion after argument has begun. The party submitting the 119charges shall furnish a copy of the charges to the other party when the charges are submitted to the court.
A requested special charge shall be given by the court if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.
La. C. Cr. P. art. 801 provides, in part:
C. A party may not assign as error the giving or failure to give a jury charge or any portion thereof unless an objection thereto is made before the jury retires or within such time as the court may reasonably cure the alleged error. The nature of the objection and grounds therefor shall be stated at the time of objection. The court shall give the party an opportunity to make the objection out of the presence of the jury.
Any such charge must be supported by the evidence, however, for the trial judge is not required to instruct the jury on abstract principles of law. State v. Gipson, 28,113 (La.App.2d Cir.6/26/96), 677 So.2d 644, writ denied, 96-2303 (La.1/31/97), 687 So.2d 402. The special charge need not be given if it is adequately covered by the general charge or in another special charge to be given. State v. Tate, 01-1658 (La.5/20/03), 851 So.2d 921, cert. denied, 541 U.S. 905, 124 S.Ct. 1604, 158 L.Ed.2d 248 (2004). Failure to give a requested jury instruction constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused or a substantial ■violation of a constitutional or statutory right. Tate, supra
Harmless error analysis begins with the premise that the evidence is otherwise sufficient to sustain the conviction if viewed from the perspective of a rational fact finder. State v. Haddad, 99-1272 (La.2/29/00), 767 So.2d 682, cert. denied, 531 U.S. 1070, 121 S.Ct. 757, 148 L.Ed.2d 660 (2001). DoThe inquiry is not whether, in a trial that occurred without the error, a guilty verdict would surely have been *592 rendered, but whether the guilty verdict actually rendered in this trial was surely unattributable to the error. Sullivan v. Louisiana, 508 U.S. 275, 113 S.Ct. 2078, 124 L.Ed.2d 182 (1993).

Specific Intent

As noted above, jurisprudence has consistently held that specific intent is an essential element of a criminal conspiracy. The question presented is whether the trial court erred by refusing, in light of the other instructions, to tell the jury that “Specific intent is an essential element of a criminal conspiracy,” and, if so, whether the error was harmless beyond a reasonable doubt.
The instructions supplied to the jury informed them that “It is unlawful for a person knowingly and intentionally to conspire to distribute methamphetamine.” The trial court read to the jury the definitions of both general and specific intent. However, the trial court also instructed the jury that “Conspiracy is an agreement or combination of two or more persons for the specific purpose of committing a crime” and that
[I]n order to convict the defendant of conspiracy to distribute methamphetamine, you must ... find (1) that the defendant entered into an agreement or combination to commit a crime with another person and (2) that the specific purpose of the agreement or combination was to commit the crime of distribution of methamphetamine and (3) that one of the parties did an act in furtherance of the object of the agreement or combination.
Because Defendant’s request for the charge on specific intent was wholly correct and required no additional explanation, the trial court should have included the requested instruction in the jury charge. However, under |21the circumstances, the error was harmless beyond a reasonable doubt because of the “specific purpose” instruction and the quality of the evidence presented. Kelley testified that Defendant told her that he could “handle that,” i.e., obtain the necessary quantity of methamphetamine, and that he had to search for some time for drugs of suitable quality. The evidence proving Defendant’s specific intent was overwhelming; his statements and his actions demonstrate that he clearly knew his role in the conspiracy was to deliver methamphetamine and that he specifically intended to do so. In cases like this one where the proof of specific intent is overwhelming, even an erroneous instruction on intent can be harmless error. State v. Bishop, 01-2548 (La.1/14/03), 835 So.2d 434.
Since the verdict in this case was surely unattributable to the trial court’s failure to give the specific intent charge, this portion of this assignment of error is without merit.

CoDefendant Confession, Requested Charge No. 1.

Although the trial court was displeased with the timing of Defendant’s requests for the other four jury charges, it ultimately decided not to include these special charges because they were found to be either inapplicable or already included in the existing charge.
By the time of Defendant’s trial, McWilliams had already pled guilty to conspiracy to distribute methamphetamine, so she was not tried together with Defendant. She was available to testify and did, in fact, testify about the events of November 2, 2009, and also about the circumstances and contents of her and Defendant’s statements to the BPSO deputies.
122The instruction Defendant requested was:
*593 A voluntary confession constitutes evidence only against a person making it. It must not be considered as evidence against an alleged co-defendant or alleged accomplice, it must be disregarded by the jury in determining the guilt or innocence of the alleged co-defendant or alleged accomplice. Blumenthal v. United States, 332 U.S. 539, 68 Sup.Ct. [S.Ct.] 248, 92 L.Ed.2d 154 [(1947)]; Krulewitch v. United States, 336 U.S. 440, 69 Sup.Ct. [S.Ct.] 716, 93 L.Ed.2d 790 [ (1949) ].
Under the circumstances of this case, this instruction was inappropriate. The instruction as requested might once have been used in cases where a statement made by one of several jointly tried code-fendants was offered as evidence at the joint trial. This instruction attempted to limit the jury’s use of the statement only against the defendant making the statement. See Delli Paoli v. United States, 352 U.S. 232, 77 S.Ct. 294, 1 L.Ed.2d 278 (1957). However, Paoli was overruled by Bruton v. United States, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968), in which the Supreme Court rejected the idea that a codefendant’s confession could be admitted into evidence at a joint trial even with a limiting instruction.
As noted, Defendant and McWilliams spoke together to the deputies, and their conjoined statement was related to the jury by Sgt. Rowlan. Under his version of the statement, both Defendant and McWilliams admitted to the conspiracy to distribute methamphetamine; his testimony described no conflict between their statements and suggested that each adopted the admissions of the other. To the contrary, McWilliams testified that she told the deputies she had not sold methamphetamine to Kelley. This was not a case where an accomplice made a statement inculpating the defendant while exculpating herself. Further, McWilliams testified and was subject to crossjexamination,23 thus avoiding the Sixth Amendment issues presented in cases such as Cruz v. New York, 481 U.S. 186, 107 S.Ct. 1714, 1715, 95 L.Ed.2d 162 (1987).
For the foregoing reasons, since the proposed instruction was not strictly correct, would have required further explanation and was generally a poor fit in this case where McWilliams testified, we find that the trial court did not commit reversible error by refusing to give the instruction.

Accomplice Charge, Requested Charges 2, S and U.

Defendant argues that each of the proposed jury instructions counseled the jury to be cautious in accepting the testimony of an alleged accomplice. He contends that Charge No. 4 specifically pointed to factors to be considered in weighing the testimony of a witness who had “turned state’s evidence.” Defendant claims that, in denying the request for these instructions, the trial court did not state that they were incorrect or confusing, but, instead, focused on the fact that they had been received at a “late date.” Defendant argues that the instructions that were actually given to the jury contained language related to the credibility of the witnesses; however, those instructions contained no specific language regarding the extreme care and caution a jury should exercise in weighing the testimony of an alleged accomplice.
In State v. Hughes, 05-0992 (La.11/29/06), 943 So.2d 1047, the supreme court observed that an accomplice is qualified to testify against a coperpetrator even if the state offers him inducements to testify; the inducements merely affect the witness’s credibility. A conviction may be ^sustained on the uncorroborated testimony of a purported accomplice, although the jury should be instructed to treat the testi *594 mony with great caution. When the accomplice’s testimony is materially corroborated by other evidence, such language is not required. An accomplice’s testimony is materially corroborated if there is evidence that confirms material points in an accomplice’s tale and confirms the defendant’s identity and some relationship to the situation.
Most of the elements of the conspiracy to distribute methamphetamine were proven through Kelley’s testimony. Other proof included the statements from Defendant and McWilliams to the deputies where “they” admitted that “[Kelley] waited while Mr. Casaday ...' went to Saline ... to get some different meth to sell me and that they had returned and that Mr. Casaday had give it to ... Ms. Mathews who, in turn, sold it to me.”
The testimony materially corroborated Kelley’s testimony on a number of points. Those facts present sufficient material corroboration to excuse the omission of an instruction for uncorroborated accomplice testimony, particularly in light of the charge given by the trial court, which included this sentence:
In evaluating the testimony of a witness, you may consider his or her ability and opportunity to observe and remember the matter about which he or she testified, his or her manner while testifying, any reason he or she may have for testifying in favor of or against either the State or the defendant, and the extent to which the testimony is supported or contradicted by other evidence.
25Compare State v. Tate, supra. Finally, Kelley was thoroughly examined and cross-examined about any advantage vel non that she obtained by testifying at Defendant’s trial. The requested charges were either not necessary or included in the general charge. We find that the trial court did not commit reversible error in refusing to give them. This assignment of error is, therefore, without merit.

Excessive Sentence

Defendant argues that his 15-year sentence is excessive. As noted, the record does not reflect that he filed a motion to reconsider sentence or otherwise objected to his sentence in the trial court. When a defendant fails to timely file a motion to reconsider sentence under La. C. Cr. P. art. 881.1, the appellate court’s review is limited to a bare claim of constitutional excessiveness. State v. Mims, 619 So.2d 1059 (La.1993); State v. Boyd, 46,321 (La. App.2d Cir.9/21/11), 72 So.3d 952.
Under constitutional review, a sentence can be excessive, even when it falls within statutory guidelines, if the punishment is so grossly disproportionate to the severity of the crime that it shocks the sense of justice and serves no purpose other than to inflict needless pain and suffering. State v. Dorthey, 623 So.2d 1276 (La.1993); State v. Fatheree, 46,686 (La.App.2d Cir.11/2/11), 77 So.3d. 1047. A sentence is considered grossly disproportionate if, when the crime and punishment are viewed in light of the harm done to society, it shocks the sense of justice. State v. Weaver, 01-0467 (La.1/15/02), 805 So.2d 166.
| ¡^Defendant's 15-year hard labor sentence was the maximum allowed under the applicable sentence provision of La. R.S. 14:26.[3] As a general rule, maximum *595 or near maximum sentences are reserved for the worst offenders and the worst offenses. State v. Woods, 41,420 (La.App.2d Cir.11/1/06), 942 So.2d 658, writs denied, 06-2768 (La.6/22/07), 959 So.2d 494, and 06-2781 (La.6/22/07), 959 So.2d 494.
Without a presentence investigation, there is little material in the record to make a determination about the appropriateness of Defendant’s sentence. The trial court’s stated reasons for the sentence primarily refer to Defendant’s criminal history, which includes a conviction for attempted capital murder. The trial court also noted that the distribution of drugs from Defendant’s home was conducted while minors were present in the home; and the record indicates this to. be true, although the minors denied knowledge of any drug activity. Nevertheless, it appears that Defendant is a multiple felony offender and it seems likely that the relative staleness of his prior convictions was due to his incarceration during some or all of the intervening time. For the foregoing reasons, we find this assignment of error to be without merit.
CONCLUSION
For the foregoing reasons, the conviction and sentence of Defendant, Raymond Casaday, is affirmed.
AFFIRMED.

. Sgt. Davis, who testified first, was not allowed to testify about the substance of the statement because, at that point, the state had not yet proven a prima facie case of conspiracy.

. As the trial court noted at sentencing, Defendant was convicted of attempted capital murder in Texas. The documents attached to the habitual offender bill indicate that Defendant tried to run over a police officer. He pled guilty in 1991 and was sentenced to serve 35 years in prison in Texas.

. The sentence range for the completed of- , fense is 2 to 30 years’ imprisonment at hard labor; the maximum sentence for conspiracy offenses that are not punishable by life imprisonment is one half of the maximum for the completed offense. Compare State v. Mendenhall, 48,028 (La.App.2d Cir.5/15/13), 115 *595 So.3d 727 (conspiracy to distribute cocaine, but the sentences are the same).