Judge Edwin A. Lombard
hThe defendant, Jermain M. Worthy, seeks review of his conviction and sentence for issuing a worthless check in an amount more than $500, a violation of La. Rev. Stat. 14:71. After review of the record in light of the applicable law and arguments of the parties, the defendant’s conviction is reversed.

Relevant Procedural History

The defendant was initially charged by bill of information on March 3, 2011, with two counts of issuing a worthless check in the amount of $500 or more. The second count was dismissed on March 11, 2015, but the first count was amended twice: (1) on March 11, 2015, Count 1 was “amended to Theft > $1500” and “Date of Offense 2/25/2008-5/8/2009” was added; (2) on April 28, 2015, Count 1 was again amended by crossing out “Theft >$1500” and adding “Amended to 14:71; Issuing worthless checks.”
The defendant pleaded not guilty to the amended count. After a one-day trial on September 15, 2015, the defendant was found guilty as charged by a six-person *374 jury. On November 2, 2015, he was sentenced to five years at hard labor, suspended, and placed on five years active probation with monthly restitution payments of $500 to the victim.
This appeal was timely filed.
1 ¿Relevant Facts
The following evidence was adduced at trial:
Nick Geraci, an investigator with the New Orleans District Attorney’s Office testified that he personally “handles all worthless checks for the city.” Mr. Geraci explained that it was standard procedure to instruct someone coming to the District Attorney’s' Office with a worthless check complaint that the check had to first be negotiated by the bank and, accordingly, it was necessary for the person filing the complaint to deposit the check, wait for it to come back “either NSF or closed account,” send a ten-day' demand letter by US Postal Service certified mail, return receipt. At the end of the ten day period, the complainant could return to District Attorney’s Office with affidavit and “bring me the case” because, according to Mr. Geraci, the failure to respond to the certified demand letter within ten days “was considered their intent to defraud the victim of the funds that they should be receiving.” Subsequently, Mr. Geraci would apply for a warrant to be issued for the person who signed the check.
Mr. Geraci testified that in this case an undated check in the amount of $26,000.00 on the account of “Worthy Properties, L.L.C., was signed by the defendant (described as being in “the construction or developer business developing properties”) and made out to Ms. Fournet (described as being in “real estate business”). Mr. Geraci explained that Ms. Fournet “held on to the check because she wanted to work this out with the two of them because they had been doing business for a long period of time.” Ms. Fournet, following Mr. Geraci’s instructions, returned to the District Attorney’s Office with an affidavit and copy of the check after the defendant failed to pay on the check within the ten-day period as demanded in the certified letters sent to but not received by the defendant labecause the letter was returned unclaimed.[1] Mr. Geraci identified State exhibit 1, a copy of the undated check; State exhibit 2, a copy of the negotiated check stamped “closed account” with a bank stamp indicating that it had been returned on May 12, 2009; and State exhibit 3, copies of four certified letters sent by Ms. Fournet to the defendant stamped “Return to Sender; Unclaimed; Unable to Forward.” Finally, Mr. Geraci stated that in the course of his investigation he spoke to the defendant, who told him that he did not have the funds and needed more time to pay, but that the defendant had not paid the $26,000.00 as of the day of trial.
On cross-examination, Mr. Geraci conceded that the undated check (as initially written by the defendant and presented tq Mr. Geraci by Ms. Fournet) was not negotiable. He insisted, however, that he did not instruct her to date the check, stating:
I didn’t tell her to do anything. I told her that the check has to be negotiated. What happened between Mr. Worthy and her, I’m not aware of, what their agreement was. But for it to come to the District Attorney’s Office for us to handle the case the check has to be negotiated.
*375 In addition, Mr. Geraci verified that the four demand letters sent to the defendant were never received by the defendant. Under further questioning, Mr. Geraci reiterated that he knew the check as -initially presented to him by Ms. Fournet could not be legally negotiated without a date and that he knew, although he did not instruct her to do so, that for the check to be negotiable “someone” would have to put a date on it. Mr. Geraci testified that he did not know the date 14the check was written, only that it would '“Approximately have to be in 2008,” although the bill of information indicated the date of the offense began in February 2008 and continued until Ms. Fournet negotiated the check in May 2009. Mr. Geraci agreed that the District Attorney’s Office had subpoenaed the defendant’s bank record, but asserted that he did not review them. Mr. Geraci had no knowledge of the agreement between the defendant and Ms. Fournet, stating only that the defendant told him he “wanted to pay the money back” to Ms. Fournet.
On redirect, Mr. Geraci admitted that the defendant and Ms. Fournet had “a working relationship” and that he “didn’t know what agreements they made amongst each other about the check and the money owed.”
Ms. Fournet testified that she was a real estate broker and owned her own real estate company. With regard to her relationship with the defendant, Ms, related: “We met at a property that he was interested in buying and we were together ever since in a sense. ... we were a great team.” She stated that in early 2005 she met the defendant, “a renovator, a contractor, but he did very good work and I was very happy to partner him with his properties.” Their business relationship lasted until 2008, although she “had really hoped for longer. We were quite a team.”
In early 2008, Ms. Fournet brokered the defendant’s purchase of a property known as “Cindy’s Place” a multi-family apartment complex in New Orleans East in need of renovation. Ms. Fournet explained that after the purchase of a property, there was generally a “transition period for acquiring the renovation funds.” According to Ms. Fournet, the defendant requested a loan of $26,000.00 while he 15was waiting for the renovation funds to become available for the “Cindy’s Place” property, adding:
“I was interested in helping him. You know, in the past things had worked similarly and I was very happy — I wished him success. I was very happy for his success.”
Thus, in late February (she was unsure of exact date), Ms. Fournet wrote the defendant a check for $26,000.00. Subsequently, at some point in June 2008, the defendant wrote the undated check to Ms. Fournet. According to Ms. Fournet, the undated check was to be used for repayment of the loan but “there was a time period needed for the funds to be substantiated.” When asked if she heard from the defendant about the check prior to December 31, 2008, Ms. Fournet answered affirmatively, then qualified “We spoke — -well, messages and then speaking about in reference to he’s interested in repaying and that arrangement would be made, for instance, with an attorney.” When questioned as to whether the defendant had ever told her to date and deposit the check, Ms. Fournet responded:
Did he tell me to? He said I ought to have. But did he tell me to do it then? That’s a good question. I don’t know. I don’t remember.
When asked if the defendant had ever given her the okay to deposit the check, Ms. Fournet stated:
*376 Initially — that’s a — that I should have deposited it and why didn’t I. There weren’t funds, sufficient funds when I called the bank to see if there were funds so there might have been that occasion.
Ms. Fournet stated that she went to the District Attorney’s Office at some unspecified date in 2009 and then dated the check herself “to make the transaction” because “[fit needed to be done in order to proceed.” Ms. Fournet then identified |flState exhibit 2 as the check she dated and deposited which was returned marked “insufficient funds.”
On cross-examination, Ms. Fournet conceded that prior to the $26,000.00 loan in this case, she had loaned the defendant money which he repaid, explaining that she and the defendant had been “business partners” with a “good working relationship.” According to Ms. Fournet, “an incident occurred” several months after she gave the defendant the check in February which “prompted” the defendant to give her the undated check. Ms. Fournet, acknowledged that she knew an undated check was not negotiable. She also claimed that she and the defendant had a written agreement:
The payment plan, but the plan would be of that same year that the amount would be paid in full. So that would have been in 2008.. So in February 2008 we did sign a document stating that his payment plan would be finished by late May and I want to say May 28th or May 23rd. So in between April and May was the scheduled repayment plan.
The written agreement was not produced at trial or submitted into evidence but when asked whether the debt would be repaid under the written agreement in installments, Ms. Fournet stated: “It would have been a one-time payment that was due to me. In other words have it paid up — and if he needed installments, we can consider that for the $26,000. For the $26,000 would be paid between that time frame.” She subsequently qualified this testimony, stating that the “payment plan” was to “date the check to negotiate it. Ms. Fournet testified that the undated check was given to her “with the anticipation that when the time was right he would let me know to deposit the check.”
Explaining the time lapse between the time the undated check was written and when she presented it to the District Attorney’s Office, Ms. Founet explained 17that she talked to the defendant periodically and he spoke about repaying her $1000 in monthly installments, twice giving her the phone number of a civil attorney to make arrangements. When asked what became of the defendant’s offer, if she had accepted or turned it down, Ms. Fournet responded:
Neither. The offer was just there. It wasn’t for me. It was really for him to make good on that offer. So I don’t accept anything that — in other words, I would liked to have received, as his word, I would liked to have received payment from him, but nothing ever came.
In explaining her reaction to the defendant’s repeated offers to pay her 1000.00 per month, the following colloquy took place:
Ms. Fournet: .... I mean the offer I’ll pay you back $1,000 a month, it does take time with a contractor for money to become available. So if you’re doing a renovation your funds are used for the purchase. In other words, down payments, that sort of thing. Maybe you have to get the property upgraded a bit so that an appraiser can come appraise the property for your renovation loan. There were many reasons why funds would be used and why a payment delay *377 was not unreasonable. So, if a renovation loan was not acquired in a timely manner, then he wouldn’t have the money or if he spent the money on something else, I don’t know. What I’m saying is that there are reasons why the money wasn’t available in the bank account.
Defense Counsel: And for that reason he was attempting through his lawyer — did you have a lawyer at all during these negotiations?
Ms. Fournet: I did not.
[[Image here]]
Defense Counsel: Would the $1,000 had been acceptable to you? Did you ever express to Jermain or his lawyer that you would accept the $1,000 per month offer?
Ms. Fournet: I did not have an opportunity to do that because if a person makes an offer and does not follow through, as has been my experience with Jermain now, he was not following through and it was difficult to contact him.
Defense Counsel: But you said in your earlier business dealings they all went very well, you were very pleased—
IsMs. Fournet: We were. He did great work. I was very proud of him. He did great work. He was smart and did a good job. So I don’t have to accept anything. This wasn’t a negotiation, it was an offer.
Defense Counsel: And that offer was before you dated and deposited' the check; is that a fair statement?
Ms. Fournet: Both.
Finally, Kevin Robert, an officer at the First National Bank USA located in Boutte, Louisiana, identified State Exhibit 5, the banking records of Worthy Properties account which was closed on October 31, 2008. He testified that the average daily balance of the account between June and October 31, 2008, was never larger than $26,000.00 but that a total of $111, 580.66 was deposited into the account during that period. On cross-examination, Mr. Robert testified that (1) in February 2008 a total of $73, 559 were made into the Worthy Properties account; (2) in March 2008, a total of $159, 422.62 was déposited into the account; (3) on March 10th, the balance was $24,000.00; (4) on March 25th, the balance was $75,440.04; (5) on March 26th, the balance was $63, 642.60; and (6) in April, a total of $113,000.00 was deposited into account. Mr. Robert also agreed that negative daily balances in the Worthy Properties account indicated that, based on his relationship with the bank, the defendant had sufficient credit with the bank for overdrafts to be paid when there were insufficient funds and, although such activity incurred an overdraft fee, it was not illegal.

Error Patent Review

A review of the record reveals that there is no indication in the record that the defendant was arraigned on the bill of information when it was amended on April 28, 2015. However, La. Code Crim. Proc. art. 555 provides that the failure to arraign a defendant is waived if the defendant “enters upon trial without |flobjecting thereto, and it shall be considered as if he had pleaded not guilty.” See State v. Adams, 2013-0627 (La.App. 4 Cir. 9/25/13), 125 So.3d 1242. Here, the defendant makes no objection that he was not arraigned on the amended bill. Thus, any failure to arraign the defendant on the second amendment to the bill is harmless.

Discussion

The defendant challenges the sufficiency of the evidence underlying his conviction. Standard of Review
In accordance with Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 *378 L.Ed.2d 560, (1979), we must determine whether the evidence, viewed in the light most favorable to the prosecution, is “sufficient to convince a rational trier of fact that all of the elements of the crime had been proved beyond a reasonable doubt.” State v. Captville, 448 So.2d 676, 678 (La. 1984). When circumstantial evidence forms the basis of the conviction, such evidence must consist of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Hamed, 2013-1655, p. 4 (La. App. 4 Cir. 8/13/2014), 147 So.3d 1191, 1193 (citing State v. Shapiro, 431 So.2d 676, 678 (La. 1983); see also La. Rev. Stat. 15:438 (“The rule as to circumstantial evidence is: assuming every fact to be proved that the evidence tends to prove, in order to convict, it must exclude every reasonable hypothesis of innocence). “This is not a separate test from Jackson v. Virginia, supra, but rather an evidentiary guideline to facilitate appellate review of whether a rational juror could have found a defendant guilty beyond a reasonable doubt.” Hamed, supra, 147 So.3d at 1193-94 (citing State v. Wright, 445 So.2d 1198, 1201 (La. 1984); see also State v. Jacobs, 504 So.2d 817, 821 (La. 1987) (all evidence, direct and circumstantial, must meet Jackson reasonable doubt standard).

Applicable Law

La. Rev.Stat. 14:71 provides in pertinent part:
A. (l)(a) Issuing worthless checks is the issuing, in exchange for anything of value, whether the exchange is contemporaneous or not, with intent to defraud, of any check, draft, or order for the payment of money upon any bank or other depository, knowing at the time of the issuing that the offender has not sufficient credit with the bank, or other depository for the payment of such check, draft, or order in full upon its presentation. (emphasis added).
Thus, to affirm the conviction for issuing a worthless check, we must find that the State proved beyond a reasonable doubt that: (1) the defendant issued, in exchange for anything of value, whether the exchange is contemporaneous or not; (2) a check, draft or order for the payment of money upon any bank or other depository; (3) knowing at the time of the issuing that the account on which drawn has insufficient funds with the financial institution on which the check is drawn to have the instrument paid in full on presentation; and (4) the instrument was issued with intent to defraud. Hamed, 2013-1655, p. 4, 147 So.3d at 1194. Accordingly, the “proper inquiry under La. Rev. Stat. 14:71(A) is not whether the defendant’s actual monetary balance was sufficient to cover a check issued by him but, rather, whether the defendant knew that he did not have sufficient credit with the bank. Hamed, supra, (citation omitted); see also State v. Bond, 584 So.2d 1212, 1215 (La. App. 4 Cir. 1991) (La. Rev. Stat 14:71, construed in context of La. Rev. Stat. 14:3 standards, is not couched in terms of defendant’s knowledge of specific | ^monetary credit balance of bank account but in terms of sufficient credit with the bank; sufficient credit with a bank is broader than specific monetary balance in banking account)..
La. Rev. Stat. 14:71 A(2) provides:
(2) The offender’s failure to pay a check, draft, or order, issued for value, within ten days after notice of its nonpayment upon presentation has been deposited by certified mail in the United States mail system addressed to the issuer thereof either at the address shown on the in *379 strument or the last known address for such person shown on the records of the bank upon which such instrument is drawn or within ten days after delivery or personal tender of the written notice to said issuer by the payee or his agent, shall be •presumptive evidence of his intent to defraud, (emphasis added).

Analysis

After reviewing the evidence adduced at trial under the Jackson v. Virginia standard, we do not support find that the State met its burden in proving beyond a reasonable doubt that the defendant issued the undated check with the intention to defraud Ms. Fournet.
First, although Mr. Geraci informed the jury that it was his opinion and the practice of the District Attorney’s Office to consider a person’s failure to respond to the certified demand letter within ten days as establishing “their intent to defraud the victim of the funds that they should be receiving, the failure to respond- to the certified demand letter only creates a re-buttable presumption of an intent to defraud. In this case, the State’s exhibit of the four certified letters sent to the defendant clearly indicates that all four letter were returned unclaimed. Because the defendant never received the letters and, thus, notice, of the demand, the presumption (based on his failure to respond to the demand) is rebutted and, in any 119event, is insufficient to establish beyond a reasonable doubt that he intended to defraud Ms. Fournet when he issued the undated check.
In addition, Ms. F.ournet testified that she and the defendant had an ongoing business relationship and that this was but one of a series of loans made to the defendant within the context of their business relationship. Although Ms. Fournet claimed a written - agreement and repayment plan existed, no such agreement was introduced into evidence. The context in which the check was written, as related by Ms. Fournet, suggests that the undated check was an informal promissory note for repayment of the loan[2] and, in any event, clearly indicates that the check was written only to deposited when funds were available and that the recipient (Ms. Four-net) accepted the cheek with full knowledge that it was not, nor was it intended to be, negotiable at the time it was written. Under these circumstances, the defendant’s bank balances is not evidence beyond a reasonable doubt that the defendant wrote the check with the intent to defraud. Ms. Fournet or had knowledge that it would be presented to the bank when there was not sufficient credit available for it to be paid in full.
Moreover, Ms. Fournet testified that the defendant repeatedly offered (personally and through attorneys) to enter into an installment agreement to settle the matter, emphatically insisting that she never responded to the defendant’s offer., Ms. Fournet’s misapprehension that the offers were not valid because the |1sdefendant “did not follow through” is not an accurate representation of Louisiana law. Pursuant to La. Civ. Code art. 1927, “[a] contract is *380 formed by the consent of the parties established through offer and acceptance” and, thus contrary to Ms. Fournet’s interpretation of the law,[3] the defendant’s inaction or failure to “follow through” before Ms. Fournet accepted his offer does not constitute evidence of an intent to defraud but, rather, that he repeatedly attempted bo resolve this matter and repay his debt to her. Thus, while Ms. Fournet may sincerely believe that the defendant’s efforts to resolve the dispute were invalid, viewed in the context of the Louisiana Civil Code, the defendant’s effort to resolve the issue in a civil context is a clear refutation of the State’s contention that this is a criminal matter and that, beyond a reasonable doubt, the defendant criminally intended to defraud Ms. Fournet. As Ms. Fournet explained, there were many reasons a contractor could be justifiably delayed in making payments and, particularly in the context of the financial and housing crisis that unfolded in 2008, the State’s evidence is insufficient to establish that when the defendant wrote the undated check, he did so with the intent to defraud his business partner, Ms. Fournet.

Conclusion

Because the State failed to prove the intent element of La. Rev. Stat. 14:71. beyond a reasonable doubt, the defendant’s conviction is reversed and further discussion is pretermitted. We do note that the defendant acknowledges his debt to Ms. Fournet and, as such, the matter should be resolved in the civil context with credit given for restitution payments received.
J^REVERSED.
LOBRANO, J., DISSENTS WITH REASONS.

. Notably, although both a copy of the undated check issued by the defendant and a copy of the dated and' negotiated check was submitted in to evidence and is in the record, the actual check is not in the record and was not presented at triál. Mr. Geraci’s testimony in- • dicates that he never saw the actual check, only the copies presented by Ms. Fournet.

. In light of the business relationship between the parties, the purported written installment repayment plan, and the circumstances indicating that the undated check was proffered as a form of promissory note, it is unclear why this became a criminal rather than civil matter. See State v. Jones, 400 So.2d 658 (La. 1981) (defendant routinely wrote checks for groceries to a store that were returned NSF but she redeemed them at the beginning of each month when she received her Social Security check, until one month she was unable to pay the full amount; appellate court reversed her conviction, finding that the arrangement was an open account credit agreement that was not subject to prosecution un- • der La, Rev. Stat. 14:71.

. Ms. Fournet indicated that she was not native to Louisiana and, thus, perhaps not conversant with Louisiana civil law but, even in common law jurisdictions (where a contract is formed by offer, acceptance, and consideration), the offer must be accepted before consideration is due.