COX, J.
*1170 After a bench trial, the defendant, Theresa Robinson ("Robinson"), was convicted of felony theft under La. R.S. 14:67. She received a suspended five-year hard labor sentence with five years' supervised probation and was also ordered to pay full restitution. Robinson appeals her conviction, arguing the evidence was insufficient for a conviction. For the following reasons, we affirm.
FACTS
In August 2012, the owners of Bailey Bark Materials ("Bailey Bark"), a landscaping business with offices in Shreveport, Louisiana, and Nacogdoches, Texas, obtained access to the Shreveport office's accounting records from the bookkeeper, Robinson, for preparation of the company's 2011 tax return. For accounting purposes, the company used QuickBooks software, with a point of sales component for printing out a daily sales summary showing the total sales for the day by payment type and an accounting software component that calculated and recorded daily deposits and reconciled them to monthly bank statements.
Upon review by a certified public accountant ("CPA"), numerous irregularities, including large numbers of uncleared deposit transactions, were discovered. Uncleared deposits result from deposits entered into the software that are not matched with deposits actually made to the bank and reflected on the month-end bank statements. The CPA determined that a user signed in under the "Administrator" login and made frequent changes to deposit transactions sufficient to raise concern that the company bank reconciliations may be inaccurate.
On the advice of the CPA, the Nacogdoches office bookkeeper re-performed the Shreveport office's monthly reconciliations for 2011 and 2012 by using the "undo" feature in QuickBooks. The newly prepared bank reconciliations confirmed a pattern of uncleared deposits from January 2011 through August 2012 that resulted in more than a $100,000 shortage to the business. Further investigation revealed that each of the uncleared deposits matched cash received by the business on the date of the deposit. After the company co-owner, Jeff Bailey, addressed all four Shreveport employees in mid-August 2012, no further uncleared deposits occurred.
Thereafter, Bailey Bark enlisted the services of David Macey, an accountant certified in fraud examination. In his October 24, 2012, report, Macey confirmed that more than $100,000 of the company's money had been lost or stolen. He recommended that all Shreveport employees be considered suspects, but named Robinson as a person of particular interest because she was responsible for preparing the bank reconciliations throughout the period and should have at least notified the company of the accumulation of uncleared deposits.
On October 29, 2012, one of the office managers of Bailey Bark filed a theft report with the Caddo Parish Sheriff's Office. After interviews with the four Shreveport employees, investigators learned Robinson was responsible for entering *1171 the deposit information into the QuickBooks accounting software. Robinson was brought in for an interview and informed of her rights, but refused to speak and requested an attorney. Thereafter, Robinson was arrested and charged with felony theft.
Robinson was tried by bench trial and found guilty as charged.[1] The trial court denied motions for new trial and post-verdict judgment of acquittal raising issues of the sufficiency of the evidence to convict Robinson. Robinson was sentenced to a suspended sentence of five years at hard labor and placed on five years' supervised probation with full restitution of $20,000 annually over a five-year period as part of her probation. She was also ordered to pay court costs and a $50 monthly fee to the Indigent Defender's Office or to serve default time of 30 days in jail.[2] Robinson appeals her conviction, urging that the State's evidence was insufficient to convict her.
LAW
The standard of appellate review for a sufficiency of the evidence claim is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt. Jackson v. Virginia , 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed. 2d 560 (1979) ; State v. Robinson , 50,643 (La. App. 2 Cir. 6/22/16), 197 So.3d 717. This standard, now legislatively embodied in La. C. Cr. P. art. 821, does not provide the appellate court with a vehicle to substitute its own appreciation of the evidence for that of the factfinder. State v. Sullivan , 51,180 (La. App. 2 Cir. 2/15/17), 216 So.3d 175. The appellate court does not assess the credibility of witnesses or reweigh evidence. State v. Dale , 50,195 (La. App. 2 Cir. 11/18/15), 180 So.3d 528, writ denied , 2015-2291 (La. 4/4/16), 190 So.3d 1203. A reviewing court accords great deference to the factfinder's decision to accept or reject the testimony of a witness in whole or in part. State v. Randle , 49,952 (La. App. 2 Cir. 6/24/15), 166 So.3d 465 ; State v. Casaday , 49,679 (La. App. 2 Cir. 2/27/15), 162 So.3d 578, writ denied , 15-0607 (La. 2/5/16), 186 So.3d 1162.
The Jackson standard is applicable in cases involving both direct and circumstantial evidence. An appellate court reviewing the sufficiency of the evidence in such cases must resolve any conflict in the direct evidence by viewing that evidence in the light most favorable to the prosecution. When the direct evidence is thus viewed, the facts established by the direct evidence and inferred from the circumstances established by that evidence must be sufficient for a rational trier of fact to conclude beyond a reasonable doubt that the defendant was guilty of every essential element of the crime. State v. Luzzo , 2016-0289 (La. App. 4 Cir. 3/1/17), 214 So.3d 55. Circumstantial evidence consists of proof of collateral facts and circumstances from which the existence of the main fact may be inferred according to reason and common experience. State v. Worthy , 2016-0431 (La. App. 4 Cir. 10/5/16), 203 So.3d 372. A conviction based upon circumstantial evidence must exclude every reasonable hypothesis of innocence. La. R.S. 15:438 ; State v. Alexander , 2014-1619 (La. App. 1 Cir. 9/18/15), 182 So.3d 126, writ denied , 2015-1912 (La. 1/25/16), 185 So.3d 748.
*1172 The elements of the crime of theft are: (1) there must be a misappropriation or taking; (2) the misappropriation or taking must be of a thing of value; (3) the thing must belong to another; and, (4) the misappropriation or taking must be with the intent to deprive the other permanently of that which is the subject of the taking. State v. Bailey , 50,097 (La. App. 2 Cir. 9/30/15), 180 So.3d 442. The prosecution must also prove the value of the stolen thing because the value is determinative of both the severity of the offense and the degree of the punishment upon conviction. Id.
DISCUSSION
On appeal, Robinson argues that no direct evidence established she took any money or made the deposits in question, and the remaining circumstantial evidence established other employees had access to the money and computers used to make sales and deposits and reconcile bank accounts. For these reasons, Robinson contends the State failed to prove beyond a reasonable doubt that she was responsible for the theft.
At trial, the State presented the testimony of six witnesses, and Robinson testified on her own behalf.
Corporal Frank Edmunson of the Caddo Parish Sheriff's Office, Financial Crimes Task Force, testified that he investigated the Bailey Bark theft. He interviewed the four employees of the Shreveport office, including the store manager, Robert Smith, the office manager, Kyle Bailey, the bookkeeper, Robinson, and the receptionist, Corenda Lee. Edmunson ruled out everyone but Robinson as a suspect because she handled the deposits and had access to QuickBooks.[3] Edmunson reviewed the bank statements and concluded the problem was that money received by Bailey Bark never made it to the bank.
Corenda Lee, the receptionist at Bailey Bark since February 2012, testified she rang up customers and counted down the drawer. She testified that she operated only the point of sale portion of the QuickBooks software and could not access the accounting portion because she did not have a login name or password. Lee confirmed she never reconciled any of the financials during her employment and that Robinson was the only person who could operate both portions of QuickBooks.
Lee testified that Robinson trained her to "do a deposit" where you go into the computer and "press in some of the things that would calculate a deposit slip." She admitted to making deposits once or twice and recalled initialing the "daily pack," which she described as "the end-of-the-day report of everything." She explained that the receipts brought back after a bank deposit were placed into the daily pack, and if the deposits were not made the next day, the money was placed in a safe. She stated she did not know where the safe key was located, but knew the key was not on top of the safe.
According to Lee, Robinson, as the bookkeeper, "handled their billing, invoices, and anything that had to do with their money," although she stated she did not know who reconciled the bank statements. She testified that Kyle Bailey began working in the Shreveport office before he became the office manager in October 2012. While Robert Smith was the officer manager, Lee had no knowledge of Smith taking money out of the register to "fix" shortages.
Kyle Bailey, the office manager at Bailey Bark's Shreveport office since October *1173 2012, testified he could not operate either of the QuickBooks programs. Based on his knowledge of the business, Bailey believed Robinson operated both ends of the software. He conceded that Smith was the office manager prior to him and left the company at the same time funds were discovered missing. He explained, however, that Smith was not fired, but left for a better opportunity. He stated Smith was never a suspect because he did not have much to do with the computer side of the company.
Bailey testified that he knew QuickBooks generated a deposit slip that was printed out before the deposit was manually taken to the bank. He confirmed that the end-of-the-day sales receipts were placed in a box, and the point of sales software created a receipt showing what should be deposited. He stated the "slip" was put in the bag with the receipts, and the deposit was made the following day. According to Bailey, an employee would log into QuickBooks the next day, and it would automatically send over "all your stuff from point of sale" and generate an amount of cash to deposit, as well as checks and credit cards "going to the bank." It would then automatically print out the information. During the time of the theft, Bailey stated "there was cash receipts not there. The cash never made it to the bank." He testified that Robinson was in charge of making sure the numbers and financials were correct and that the person in charge of QuickBooks should be aware of any problems. He further testified that he never made a deposit and was not the office manager during the time of the thefts. Rather, during that time, Bailey was never in the Shreveport office and worked across the street on equipment.
On cross-examination, Bailey conceded it was not Bailey Bark's policy to match deposits with the sales of the day at the time of the thefts. He stated that Smith had the password for the point of sale portion of the software, but again stated he had no information that Smith was taking money out of the register to fix shortages. Bailey confirmed there was a safe where the deposits were kept until the next morning, but he did not know the safe required a key or where the key was located. He admitted he had authority to pay bills for the business and sign checks during the time of the thefts. He further admitted that Smith also signed Jeff Bailey's name on checks in order to pay the bills. He stated that neither Corenda Lee nor Robinson had the authority to sign checks.
Becky Garwood, the financial officer for the Nacogdoches office, testified that she was responsible for reconciling the company bank accounts, which included making the daily bank deposits, checking the deposits and deposit slips, and reviewing receivables and payables. Garwood was also able to "dial into" the Shreveport office and work in their computer system, a practice that began in 2012.
In 2012, Garwood learned that money was missing from the Shreveport office where Robinson was in charge of the accounting. She stated that Robinson was supposed to be reconciling the books every month during the time the money went missing, but "it wasn't actually reconciled" and "was left out of balance." Garwood explained that this happened when transactions were deleted, including "credit cards that had been deleted, and cash that was just left outstanding but marked as cleared." At some point, she was able to reconcile the account after learning to put deleted items back into QuickBooks.
Garwood testified she attempted to gain access to the Shreveport QuickBooks software from Robinson on multiple occasions because Jeff Bailey wanted her to make sure it was reconciled. When Garwood requested access to the software, Robinson *1174 told her "that she was doing it [reconciliations] and that everything was okay," so Garwood stated that she "let it go." She testified that CPA Singer got the administrative password after Jeff Bailey acquired it from Robinson. Afterwards, Garwood was able to obtain the daily pack or point of sale records and check to make sure everything downloaded into QuickBooks was correct. She attempted to assure that all cash, checks, and credit cards had individual customer receipts to match the total amount for the day, but discovered "that it wasn't a QuickBooks mistake, that this was actual cash that was transferred."
Garwood explained that QuickBooks prints out one deposit amount that should go to the bank. At the end of the month, during reconciliation, the deposits are matched to the amounts that were actually received from customers. Any unaccounted amounts are called outstanding, meaning the bank had not yet received the amount, although the business had. According to Garwood, QuickBooks could balance outstanding amounts, and it was normal to have some outstanding amounts at the end of the month. However, she testified that "you don't have deposits from the first of a month that never clear." In this case, she stated that the amounts left outstanding "were deleted, or credits were created, or credit cards were deleted or added to try to balance out the books." She agreed that someone was creating false credits and credit cards to supplement the missing cash.
Garwood identified an exhibit showing a list of uncleared deposits from February 26, 2011 to August 2012, which was prepared by David Macey and included in his expert report. She described the document as showing "the date of the cash receipt" and "the cash deposit per point of sale software." She stated the total amount of uncleared deposits shown was $100,017.09. She concluded that the exhibit showed cash received by the business was never deposited into the bank and subsequently balanced out within QuickBooks. Garwood testified that QuickBooks was not a difficult software, and anyone with a basic understanding of it would have noticed this amount of uncleared deposits. She stated that only Robinson was responsible for balancing out the accounts in the Shreveport office from February 2011 to August 2012.
On cross-examination, Garwood admitted she did not recall specific dates, but the "deletions and additions were all done under the 'Administrator' password." She explained that the Administrator user could do any kind of transaction in QuickBooks, including changing and deleting in the financial portion. She stated it could have been done by anyone if they had the password. She was not aware of Smith having the Administrator password, but testified that Robinson would have been set up with the password when the former bookkeeper left in November 2010. Garwood did not know whether Robinson and the former bookkeeper used the same password or whether the software was set up to change the password every so often. She testified that in the Nacogdoches office, she could keep her password forever.
Jeff Bailey, the co-owner of Bailey Bark, testified he was alerted to possible fraud and missing funds in his Shreveport office. He confirmed that Garwood contacted him to get access to QuickBooks at the Shreveport location because Robinson would not provide the password, and he instructed Robinson to provide Garwood with the information. He testified that after he spoke with his Shreveport employees regarding the missing funds and advised them he was going to investigate the matter, the theft stopped.
On cross-examination, Bailey testified that Smith ran the office and mainly supervised *1175 sales and dealt with customers. He described Smith as the office manager who was not responsible for the books.
Robert Smith, the office manager at Bailey Bark from February 2011 to September 2012, testified that he handled customer relations, ordered materials, set up deliveries, loaded trucks, and was responsible for "everything on the yard." Smith had the authority to write checks, but could not make cash purchases on behalf of the business. He used the point of sale portion of QuickBooks, but could not access the financial portion. He denied having an Administrator login for the financial program or knowing Robinson's login information. According to Smith, Robinson would have been the only person who had that information. He testified that he did not go back and check behind Robinson because he believed the corporate office did that. He was not an accountant and could not balance the books.
Smith stated he occasionally took deposits to the bank and would bring the bank bag back to the office with the printout from the bank. He testified that he deposited everything he was given to deposit. He claimed he first heard of the thefts after he left Bailey Bark for another job, and he was not accused of taking any money and denied doing so. Smith testified he was not aware that Lee or Kyle Bailey ever balanced the company books.
On cross-examination, Smith testified that he never initialed the deposit slips. Although he admitted to printing one or two deposit slips, he explained that by printing he meant that he "put them in there" while Robinson was sitting there. Additionally, he testified he was not required to enter the password into the computer at that time. He did not know whether the prior bookkeeper's password had been changed, never saw Kyle Bailey use the computer, and denied taking money out of the register to make up a shortage. Smith confirmed that deposits for the day were kept in a safe, and the key was in a drawer. He did not know who was aware of that information and further testified that the safe had a keypad.
After Smith's testimony, the State and the defense stipulated to the introduction into evidence of the report by fraud examiner, David Macey. The State rested its case. The exhibit included Macey's expert opinion, which concluded that "cash deposits shown in Exhibit B [S-1], represent actual cash receipts by the Company that have been either lost or stolen." In the report, he also concluded that "there is a clear trail of evidence to show that these deposits represent actual sales receipts that were tallied and recorded into the Company's software," but that "these funds were not, in fact, deposited into the Company's operating bank account."
Finally, Robinson testified. She began working for Bailey Bark on March 23, 2008, as a receptionist. She was promoted to bookkeeper, accountant, and assistant office manager in 2010 after the former office manager trained her how to use QuickBooks on the point of sales program. Robinson testified that "99 percent of the checks was written off the printer of the computer system on the financial QuickBooks side." She stated that Smith knew how to do checks and access the financial portion of QuickBooks, but she did not know if he knew the password.
Robinson stated the financial portion of QuickBooks was always open when she got to work at 8:30 a.m. She stated either Smith or Kyle Bailey would open the business when trucks would deliver materials early and the drivers would have to be paid. Therefore, Robinson stated she was sure somebody obtained access to QuickBooks to write checks. She testified that she did not begin reconciling bank statements *1176 until March 2011. According to Robinson, Smith never supervised her.
Robinson confirmed the other employees' testimony regarding the preparation of the daily pack, which was put in a file cabinet. She also confirmed that the deposits of checks, money orders, or cash were prepared in the financial portion of QuickBooks, and deposits cannot be done on the points of sales software. She explained that nobody checked to see whether the daily pack matched with daily sales. She testified that Lee also did deposits and had access to the financial portion of QuickBooks. Although Kyle Bailey also knew how to get into the financial portion, Robinson stated he never had to do a deposit.
Robinson denied that Garwood called her about reconciling books, although she admitted reconciling the books each month after the bank statement arrived showing a beginning and ending balance, as well as deposits and credits. She testified she first checked off deposits and accessed the financial portion of QuickBooks where she would "go down to bank reconciliation." She would then enter the beginning and ending balance amounts from the bank statement and "start checking off the deposits, making sure they matching up with your bank statement and what's in your computer system." Robinson also checked the credits or credit card transactions and the checks. In the end, she stated, "you'll come up with an ending balance." She explained that once the numbers were in and balanced, you pressed the "reconcile" command, and it balanced out.
According to Robinson, only once was the balance off by a "dollar and some odd cents" when she called Garwood who told her to recheck everything. Garwood instructed Robinson that if it failed to balance, hit the "force reconcile" command, and the system would reconcile the accounts. Robinson claimed to have taught herself how to reconcile in QuickBooks, and the former bookkeeper only showed her the basics, such as how to pay bills and record receivables. She denied knowing how to make deletions or changes in QuickBooks, claiming she was never "taught or trained how to go in to do deletions, or to do a correction, or how to remove something off the system."
Robinson conceded that Jeff Bailey called her for the Administrator password, but denied knowing it. She testified that she called the computer specialist who handled QuickBooks for the company, but he was never able to open the software with the Administrator password provided to him. Robinson claimed she was never required to use a password and that the "system was already up when I got to work." She stated the password "would just come up," and she continued to use what was saved in the system.
Robinson also confirmed that the safe was opened with a key kept in the cash register and that the safe also had a combination lock. Additionally, Robinson, as well as Smith, Lee, and Kyle Bailey, knew the combination to the safe and where the key was located.
Robinson testified she was off every Wednesday and was unable to make deposits on that day. She stated that when she came back to work, everything was in order, meaning the deposits had been made and the checks were written without her being there. On her days off, Robinson stated that someone would be required to be in the system in order to write checks and make deposits. She testified those individuals would have been Smith, Lee, and Kyle Bailey. She claimed that Smith was at the employee meeting with Jeff Bailey in July 2012 and denied taking any money from Bailey Bark or noticing $10,000 to $15,000 missing at any given time.
On cross-examination, Robinson admitted to having a felony theft conviction in *1177 2000. She testified that all of the previous witnesses were being untruthful. She claimed she did not know if a reconciliation could be forced with a $10,000 discrepancy because she never had a large discrepancy. She denied she had any uncleared deposits the entire time she worked for Bailey Bark. She defined an uncleared deposit as one "that just hasn't shown up on a bank statement yet," and she stated it was common for an uncleared deposit to linger until the next month. She testified that if the deposit did not show up the following month, she would call it to Garwood's attention. She also denied refusing to give Garwood the password or ever giving it to Garwood after Jeff Bailey called her.
Robinson testified that all of the employees prepared deposit slips, but stated she was the only one who reconciled the statements every month. When shown the S-1 exhibit, she denied seeing any of the uncleared deposits, but admitted it would be something she should notice. She was unable to confirm the accuracy of the exhibit and denied being responsible for the $100,000 in missing funds. When asked if she alerted anyone in a three-month span that $12,000 was missing, she stated she did not "because when I was doing bank statements, there wasn't any missing cash."
Robinson admitted to handling the bank statements in August, September, and November 2011, but insisted those statements reconciled. She stated she did not have to force reconcile any of those months. She testified that if there were uncleared deposits, she would have seen them. She recalled that she reconciled Bailey Bark's statements in July 2012. She stated she told Jeff Bailey she did not take any money from the business and admitted to asking for an attorney when the investigators began to question her.
The court questioned Robinson regarding the daily pack. Robinson repeated her explanation of the process, adding that receipts and closed drawer reports were put in a brown envelope placed in a locked file cabinet, and money orders, checks, and cash would go into a bank bag for deposit and then into the locked safe. She further explained that one deposit slip was prepared for the bank, but two receipts were received from the bank-one for cash and one for money orders and checks. Robinson stated that anyone who closed the drawer could prepare the deposit slip on Wednesday, and she denied handling cash on other days when discrepancies occurred. When shown the S-1 exhibit, she stated there was no way to know who made the deposits on the particular days because no person initialed a deposit slip. Robinson stated that "at the end of the day, if you're working the cash register," and "you go and do your end of day, that person also does the deposit slip."
After Robinson's testimony, the trial court took the case under advisement. The trial court found Robinson guilty as charged of felony theft. The court noted Robinson was in charge of the accounting in QuickBooks; only a handful of uncleared deposits occurred on a Wednesday, which was Robinson's day off (of the roughly 75 deposits, fewer than five occurred on a Wednesday); and, it did not believe her testimony was truthful based on her demeanor on the stand and her body language.
We find the evidence sufficient to support Robinson's conviction for felony theft. The existence of more than $100,000 in uncleared deposits was established through the expert report of accountant David Macey, as well as the testimony of Garwood, who re-performed monthly reconciliations for 2011 and 2012 by using the "undo" feature in QuickBooks. Simply stated, these uncleared deposits represented money received by the company that was *1178 never deposited into the business bank account and hidden through the manipulation of the financial portion of the QuickBooks software. This evidence was sufficient to establish the elements of felony theft.
Robinson could not refute the existence of the discrepancies, but claimed she was not responsible for them. While the identity of the perpetrator was not established by direct evidence, the circumstantial evidence, when viewed in the light most favorable to the State, is sufficient to establish Robinson's guilt beyond a reasonable doubt. The trial court accepted the testimonies of the other employees that they did not have access to QuickBooks for either creating the deposits or reconciling the bank statements. Both Smith and Lee denied having access to the financial portion of the software. Although Smith testified that he prepared some deposit slips, he clearly stated Robinson was always present. Lee's participation was minimal, and she began employment sometime after the thefts began. From this evidence, such credibility determinations were reasonable and will not be disturbed on appeal.
Likewise, the trial court rejected Robinson's testimony due to her lack of credibility. Robinson admitted she was the sole individual who reconciled the monthly bank statements. While the evidence showed the money was actually misappropriated when the deposit slips were prepared, it also established that the theft was concealed during the end-of-the-month bank statement reconciliation. Further, Robinson made questionable statements regarding her need for an Administrator login, and she also contradicted both Jeff Bailey's and Garwood's testimony regarding their attempts and ultimate receipt of the password from Robinson.
Despite her claims of not knowing how to delete transactions, Robinson's testimony clearly shows she knew how to "force reconcile" the bank accounts at the end of the month for small amounts. Her claims that she never saw the substantial discrepancies in the monthly statements lack trustworthiness. Thus, we find the trial court was reasonable in rejecting Robinson's testimony as self-serving and not credible. Ultimately, Robinson's guilt can be inferred from the evidence showing the extent of her control over the financial portion of QuickBooks, including account reconciliation, efforts to shift culpability to other employees, and attempts to plead ignorance of and distance herself from knowledge of the notable discrepancies. The facts and evidence exclude every other reasonable hypothesis of innocence, regardless of any evidence showing that minimal deposits were made on Robinson's day off or at any other time by other employees. This assignment of error is without merit.
CONCLUSION
For the foregoing reasons, Robinson's conviction and sentence are affirmed.
AFFIRMED.

Robinson waived her right to a jury trial.

Robinson was employed at the time of sentencing. Thus, her indigency is not apparent from the record despite her representation by the Indigent Defender's Office and the Appellate Project so as to preclude the imposition of default time as set forth in State v. Pratt , 50,152 (La. App. 2 Cir. 12/30/15), 184 So.3d 816, writ denied , 16-0123 (La. 1/25/17), 215 So.3d 262.

On cross-examination, Edmunson admitted Lee and Smith also made deposits and would give the deposit slips to Robinson without initialing them.